Joseph TOUSSAINT, et al., Plaintiffs,

v.

Daniel J. McCARTHY, et al., Defendants.

No. C–73–1422 SAW.

United States District Court, N.D. California.

Oct. 18, 1984.

Sidney M. Wolinsky, Anita Arriola, Public Advocates, Inc., Morris J. Baller, Mexican-American Legal Defense and Education Fund, James C. Sturdevant, Law Offices of James C. Sturdevant, Bernard Zimmerman, Sarah Flanagan, Mark A. Chavez, Sanford Jay Rosen, Ellen Sue Goldblatt, Barbara Y. Phillips, Law Offices of Sanford Jay Rosen, San Francisco, Cal., Donald H. Specter, Michael Satris, Prison Law Office, San Quentin, Cal., Jack Greenberg, Deborah Fins, New York City, for plaintiffs.

John K. Van de Kamp, Atty. Gen., of Cal., Karl S. Mayer, Thomas P. Dove, Deputy Attys. Gen., San Francisco, Cal., for defendants.

WEIGEL, Senior District Judge.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON MOTION FOR ADJUDICATION OF CONTEMPT

Plaintiffs, a class consisting of prisoners confined in segregation at four California prisons, move for an order holding four named respondents in civil contempt of court. The respondents are Glenn A. Mueller, Theodore J. Smith, Paul Morris, and Joseph Campoy. Mueller is a correctional lieutenant stationed at the California State Prison at Folsom ("Folsom"). In November, 1983, he was Chief Housing Officer at Folsom. Smith is also a correctional lieutenant at Folsom. During November, 1983, he was in charge of security in Building 1, Section A at Folsom. Morris, now Deputy Director of Institutions for the California Department of Corrections ("CDC"), served as Warden of Folsom until December 31, 1983. Campoy served as Deputy Warden at Folsom until he replaced Morris as Warden in January, 1984.

Plaintiffs allege violations of three separate provisions of orders entered by this Court. The first, the "anti-retaliation order," is part of an order entered March 18, 1974, and states:[1]

[D]efendants PROCUNIER, STONE, GUNN, NELSON and PATTERSON, their officers, agents, servants, employees, and all persons acting in concert or participation with them, are enjoined and restrained from the following:

1. Threatening plaintiffs with punishment, penalty or other reprisals, or imposing punishment, penalty or other reprisals, for initiating and prosecuting the instant action;

2. Threatening other prisoners with punishment, penalty, or other reprisals, or imposing penalty, punishment or other reprisals, for lawfully assisting in prosecution of the instant action, in such respects, for example, as by providing written answers to questionnaires, affidavits, documents lawfully in their possession, or other information to plaintiffs' counsel and certified law students.

The second, the "anti-subversion order," is Part V of a preliminary injunction entered January 14, 1983, and made applicable to Folsom by order dated August 3, 1983. It states:

No person who has notice of this Preliminary Injunction shall fail to comply with the letter and spirit hereof nor shall any such person subvert the letter and spirit hereof by any sham, indirection, or other artifice.

The third, the "double-celling order," is a portion of Part II of the same preliminary injunction. It states:

Defendants shall with all reasonable dispatch provide as follows with respect to all members of the plaintiff class:

. . . .

No prisoner shall be involuntarily double-celled with another prisoner for more than 30 days in any 12-month period. Double-celling shall only occur in cells larger than 50 square feet, in which a second bed, cot or bunk is provided.

All of the alleged violations by respondents of the anti-retaliation and anti-sub-

---

1. Respondents do not dispute that the provisions of this order are fully applicable to each of them, as successors of the original defendants and as employees of such successors.

version orders are related to a stabbing incident that occurred in Building 1, Section A on the morning of November 17, 1983. The factual circumstances surrounding this incident were thoroughly explored in a hearing on plaintiffs' motion for contempt.

On November 14, 1983, Tiers 4 and 5 of Building 1, Section A were in use as an "Emergency Housing Unit," or "EHU." The EHU had been created on October 3, 1983, in the aftermath of an incident on September 14, 1983, when a black inmate was stabbed to death by an inmate of Hispanic descent. Most inmates confined in the EHU had been placed there because they were identified by prison authorities as associated with gangs responsible for inter-racial violence.

The two EHU tiers were segregated according to race and gang affiliation. Thus, Tier 4 housed only black inmates, approximately 30 in number, many of whom were identified with a prison gang known as the "Black Guerrilla Family." Tier 5 housed only Hispanic inmates, also about 30 in number, many of whom were identified with another prison gang, the "Mexican Mafia." The Black Guerrilla Family and the Mexican Mafia are believed by prison authorities to be mutually hostile.

On November 15, at the direction of respondents Morris and Campoy, prison officials began transferring large numbers of inmates from cell to cell, with the avowed purpose of reducing double-celling in segregation in order to comply with the Court's double-celling order. The plan ("the November 11 plan"), as later explained by Morris, was (1) to move EHU inmates into vacant general population beds; (2) to transfer double-celled segregation inmates into double-celled confinement on all five tiers of Building 1, Section A; and (3) to redesignate Tiers 4 and 5 as part of a "general population" unit. In this way, the inmates would still be double-celled, but they would not be held in "segregation," and thus the Court's order would not be violated.

On November 15 and 16, some parts of this plan were carried out. About 80 segregated inmates were transferred to Building 1, Section A. Some EHU inmates were transferred to other general population units. Tiers 4 and 5 were desegregated, but only partially. By the end of November 16, Tier 4 housed 5 Hispanic inmates and 23 black inmates. Tier 5 housed 6 black inmates, 20 Hispanic inmates, and 5 inmates from other ethnic groups. On the same day, Tiers 4 and 5 were converted to "general population" status. This allowed the residents to dine in a group mess hall (rather than in their cells) and to mingle in the unit more freely than when the unit had been classified as an EHU.

To accomplish the many transfers out of segregation needed to execute the November 11 plan, prison officials adopted unusual procedures to select the segregated inmates who would be released into the general population. Inmates who had assaulted prison staff and inmates held in segregation for their own protection were excluded from consideration. Other segregated inmates were not. Inmates were not systematically screened for suspected gang affiliation prior to transfer. Some of the Hispanic inmates placed on the formerly all-black Tier 4 were suspected associates of the Mexican Mafia. Some of the blacks placed on the formerly all-Hispanic Tier 5 were suspected associates of the Black Guerrilla Family.

On November 16, the inmates housed in Building 1 exercised and ate their evening meal together without incident. On the morning of November 17, as the Building 1 inmates returned from breakfast, a disturbance began on the second tier when several black inmates assaulted and stabbed a Hispanic inmate. This turned out to be a diversion. As correctional officers responded to quell the disturbance, they left the bar locking device used to open the cells on Tier 4 unattended. The bar was thrown into the "open" position and a number of assailants, never satisfactorily identified, rushed into the cells of the few Hispanic inmates on the tier and began stabbing the occupants. Three Hispanic inmates on Tier 4 were stabbed, and stabbing attempts were made on two others. None of the resulting injuries was life-threatening.

Plaintiffs contend that this sequence of events reflects an attempt by one or more respondents to provoke a violent incident, thereby endangering the safety of members of the plaintiff class in violation of the anti-retaliation order. Plaintiffs further contend that one or more respondents undertook this attempt with the aim of discrediting the Court's double-celling order, in violation of the anti-subversion order. Plaintiffs say that Warden Morris participated in this attempt by absenting himself from Folsom during the period of tension that accompanied the mass transfers out of segregation. Deputy Warden Campoy is alleged to have participated by setting unreasonably short deadlines for the transfers in spite of his long experience at the prison, which according to plaintiffs should have alerted him to the danger of violence. Lieutenant Mueller is alleged to have participated by assigning the small number of Hispanics to the previously all-black, gang-segregated Tier 4, and by assigning the small number of blacks to the previously all-Hispanic, gang-segregated Tier 5. Lieutenant Smith is alleged to have participated by failing to augment security in Building 1, Section A in response to the increased levels of tension among inmates accompanying the numerous transfers out of segregation and the conversion of the unit from EHU to general population.

■ To establish civil contempt, a movant must show by clear and convincing evidence that a specific order of court has been violated. *See Shuffler v. Heritage Bank,* 720 F.2d 1141, 1146 (9th Cir.1983) ("specific and definite" order required); *Falstaff Brewing Corp. v. Miller Brewing Corp.,* 702 F.2d 770, 777 n. 1 (9th Cir.1983) ("clear and convincing evidence" standard of proof). Normally, proof of bad intent is not necessary. *Donovan v. Mazzola,* 716 F.2d 1226, 1240 (9th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). As to the anti-retaliation and anti-subversion orders, clear and convincing proof of intent is required, however, because intent is itself an essential element of contumacious retaliation or subversion.

■ Plaintiffs' allegations are supported by significant circumstantial evidence.

However, that evidence is insufficient to meet the heavy burden of proof applicable to the anti-retaliation and anti-subversion aspects of plaintiffs' motion. Accordingly, the motion for an adjudication of contempt as to these orders is denied.

The double-celling order became applicable to Folsom on August 3, 1983. On that date, respondent Warden Morris, a defendant in the principal action, became subject to a duty to end all double-celling in excess of that permitted by the order "with all reasonable dispatch." Respondent Campoy became subject to an identical duty upon his accession to the office of Warden. Yet double-celling prohibited by the order was not ended until April 24, 1984, more than eight months after the effective date of the order and well after plaintiffs had filed the present action for contempt. In the interim, some 220 inmates were double-celled in segregation as late as November 11, 1983, and 60 were so double-celled as late as March 8, 1984.

■ Based upon the testimony of two defendants and numerous other witnesses, the Court in entering the preliminary injunction found that the practice of double-celling inmates under the conditions now prevailing in defendants' segregated housing units is "inhuman." *Toussaint v. Rushen,* 553 F.Supp. 1365, 1371, 1379 (N.D. Cal.1983), *aff'd in relevant part,* 722 F.2d 1490 (9th Cir.1984). In the light of this finding, a delay of the proportions of that involved here is hardly consistent with an undertaking to end double-celling with "all reasonable dispatch." The undisputed length of the delay is sufficient in itself to establish that respondents Morris and Campoy and others in the CDC did not act with reasonable dispatch. Consequently the burden shifted to respondents to show "categorically and in detail" why they were unable to end double-celling sooner. *See Donovan,* 716 F.2d at 1240; *United States v. Rylander,* 656 F.2d 1313, 1318 (9th Cir. 1981), *rev'd on other grounds,* 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983).

Respondents failed to carry this burden. By their own admissions, the only measure

undertaken between August 3 and November 11 to end double-celling was an acceleration of the normal process of reviewing files of segregated inmates to determine whether the inmates meet the standards for continued retention in segregation. The standards themselves were not altered.[2] Although this step failed significantly to reduce double-celling in segregation, no additional measure was undertaken until November 11, when the November 11 plan was formulated. After the violent incident of November 17, this plan was abandoned.[3] Not until November 23 did respondent Morris formulate a coherent plan to eliminate double-celling in Folsom segregation by transferring some segregated inmates to San Quentin Prison. Even this plan proved inadequate, since it did not result in the termination of all double-celling in segregation for another five months, an unacceptably long period given the circumstances.[4]

The Court finds that respondents Morris and Campoy failed to act with all reasonable dispatch to limit double-celling and that that failure violated the order of this Court. Plaintiffs' motion for an adjudication of civil contempt is therefore accordingly granted as to those respondents.

The purpose of this civil contempt proceeding is not to punish but to secure future compliance with orders of court.[5] *See Shuffler,* 720 F.2d at 1147; *Falstaff,* 702 F.2d at 778. Therefore no sanctions will be imposed at this time. If any respondent hereafter violates any order of the Court against double-celling, that respondent will face a fine of $500.00 per day for each day of violation and such other sanctions as the Court may impose as an appropriate means of insuring compliance.

IT IS SO ORDERED.

---

2. On the admittedly doubtful assumption that authorities at Folsom do not regularly retain inmates in segregation without sufficient basis under the governing standards, accelerated review without a change in the standards themselves could not be expected to produce a significant reduction in the segregated population.

3. Respondents presented no evidence to show why this plan was abandoned, or why it could not have succeeded in ending double-celling in segregation promptly if continued in a more careful manner. Any suggestion that discontinuation of the November 11 plan was necessary because the plan entailed an unacceptable risk of violence is forestalled by respondents' repeated and vigorous assertions that the plan, even when viewed in hindsight, did not entail such an unacceptable risk.

4. Respondents advance no contention that any of the double-celling which continued through April 24 constituted the carefully limited double-celling permitted by the Court's double-celling order.

5. Plaintiffs make no claim for compensation based upon the delay in ending double-celling in segregation at Folsom.