**Will STONE; Henry Washington; Albert Matias; Freddy Tooks; Jo Ann Sparks, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,**

**v.**

**CITY AND COUNTY OF SAN FRANCISCO; Michael Hennessey, Sheriff; Mayor of the City and County of San Francisco; Department of Public Health of the City and County of San Francisco, Defendants–Appellants.**

No. 91–16927.

United States Court of Appeals, Ninth Circuit.

Argued March 10, 1992.

Submitted April 17, 1992.

Decided June 25, 1992.

As Amended July 9, 1992.

Order Amending Opinion and Denying Rehearing and Rehearing En Banc Aug. 25, 1992.

852

Dennis Aftergut, Deputy City Atty., San Francisco, Cal., for defendants-appellants.

Beth H. Parker, McCutchen, Doyle, Brown & Enerson, San Francisco, Cal., for plaintiffs-appellees.

Before: CHOY, FARRIS, and RYMER, Circuit Judges.

CHOY, Circuit Judge:

The City and County of San Francisco ("the City") appeals a contempt order against it for its failure to comply with provisions of a consent decree governing population levels at one of the City's jails. We affirm the entry of the contempt order, but vacate that part of the order allowing the Sheriff to override applicable state laws in conducting early release.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs are pretrial detainees in San Francisco's jail on the sixth floor of the Hall of Justice ("Jail No. 1"). The plaintiffs filed a class action in 1978 challenging the conditions of their confinement. The primary objectionable condition was the population level at Jail No. 1.

On July 15, 1982, the parties agreed to a consent decree, which the district court entered. The consent decree included a provision that the jail's housing areas should not regularly house more inmates than the capacity set by the California Board of Corrections.[1]

In June 1985, the plaintiffs moved to hold the City in contempt for violating provisions of the decree, including the provision concerning mandated population levels. In May 1986, the district court ordered the City to comply with the decree's provisions and appointed a Special Master to investigate, report, and recommend actions the City should take to ensure compliance. As a result of continued noncompliance by the City, the Special Master recommended in March 1987 that the district court impose sanctions when the jail exceeded its population capacity.

The district court held a hearing in April 1987 on the plaintiffs' contempt motion, but continued the matter until June to give the City an opportunity to present a plan to address the overcrowding problem. In August 1987, the City agreed that if it failed to achieve either the overall capacity level for the entire jail or the individual capacity levels for housing units, the district court could impose monetary sanctions. The City further agreed that the court could grant special powers to the Sheriff to cope

---

**1.** The parties also negotiated a number of other conditions for the jail's operation not relevant to this appeal.

with the overcrowding problem, including the power to conduct citation release of inmates and the power to release certain inmates before they had served their entire sentences.[2]

After a prolonged period of compliance, Jail No. 1 became overcrowded again. On November 28, 1987 the district court issued an order to show cause why the City should not be held in contempt. The court held the motion under submission while the City worked to complete a new jail facility in San Bruno ("Jail No. 7"). At a hearing in January 1988, the district court found that the City had made "substantial progress" towards compliance but that Jail No. 1 remained overcrowded. The court gave the City further powers to control the inmate population by allowing the Sheriff to release "all sentenced prisoners within San Francisco County Jail system who have served 90%, 80%, and 70% of their sentences" as necessary to reach the population limits. Moreover, the court expanded the Sheriff's powers by allowing him to release inmates even when such release contravened applicable state laws.

Despite the Sheriff's liberal use of these powers, overcrowding persisted. The district court held hearings in April, July, and October of 1988 on the pending motion for contempt, but each time it continued the hearing to allow the City the opportunity to meet the population limits. Finally, at a status conference the court ordered the imposition of fines of $300 per inmate per day if the City failed to comply by March 15, 1989.

The City complied by the deadline by shifting inmates to other jails, by making use of Jail No. 7, and by relying on the Sheriff's early-release powers. On June 19, 1989, the court extended the consent decree beyond its seven-year term and denied the pending contempt motion.

The City remained in compliance with the population limits for almost two years until February 19, 1991. After that date the total jail capacity was exceeded on numerous occasions, and the plaintiffs filed a contempt motion on May 30, 1991. At a hearing on July 31, 1991, the district court found that the City had violated the population limits at Jail No. 1. The City requested time to prepare a plan to alleviate the overcrowding problem and to obtain funds to implement the plan. The court postponed a second hearing in September to allow the City further time to prepare. The City submitted its plan to the court on October 7, 1991. Jail No. 1 was chronically overcrowded during the intervening period. At the November hearing, the City requested more time to implement its plan to cope with a recent surge in the jail population. The court took the matter under submission.

On December 17, 1991, the district court found the City in contempt because it had not taken "all reasonable steps" to comply with the population limits. The court ordered that the City immediately comply with the consent decree and imposed sanctions of $300 per day per inmate for each day after January 1, 1992 that the City violated the order. The court expanded the Sheriff's powers to reduce population levels by allowing him to release prisoners who had served 60% and then 50% of time served.[3]

---

**2.** The court's order authorized the Sheriff to "release by citation all misdemeanants, whose arrest record does not include arrest for crimes involving the use of a dangerous weapon and who have a California identification or substitute identification...." *Stone v. City & County of San Francisco*, No. C–78–2774 (N.D.Cal. Jan 14, 1988) (order modifying Amended Order). If the use of that power proved ineffective, the Sheriff was also authorized to release misdemeanants who had served 90% of their sentences. *Id.* This order did not authorize the Sheriff to disregard any applicable state laws.

**3.** The court added, "[T]he Sheriff shall not be bound by state laws which restrict participation of inmates in work furlough programs (Cal.Penal Code § 1208), work in lieu of incarceration programs (Cal.Penal Code § 4024.2), electronic home detention programs (Cal.Penal Code § 1203.016), or county parole placement programs (Cal.Penal Code § 3076)." *Stone v. City & County of San Francisco*, No. C–78–2774 (N.D.Cal. Dec. 17, 1991) (Memorandum Opinion and Order finding City in contempt). The court modified the order the next day to clarify that the Sheriff was authorized to release both felons and misdemeanants.

On December 26, 1991, the City filed a motion to stay the order or, in the alternative, reconsider the court's opinion. The court denied both requests on December 30th, but modified the order by requiring that the fines be placed in fund to be controlled and administered by the City and used for programs to reduce Jail No. 1's population levels. On December 31st, this court temporarily stayed the district court's order pending appeal.

After the parties filed their briefs, we granted the District Attorney for the City leave to file an *amicus* brief. The District Attorney's brief urged us to invalidate portions of the district court's order because it violated principles of federalism. In particular the *amicus* was concerned about those portions of the court's orders that allowed the Sheriff to override applicable state laws and state court criminal sentences ordered pursuant to those laws. Because these issues also troubled the panel, we ordered supplemental briefing by the parties.

## II. DISCUSSION

### A. *Jurisdiction*

As a general rule, contempt orders against a party to pending proceeding are not considered final under 28 U.S.C. § 1291. *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 651 (9th Cir. 1981); *Hughes v. Sharp*, 476 F.2d 975 (9th Cir.1973).

■ Where the contempt order is a *post-judgment* order imposing *sanctions*, however, the order may be final for the pur-

poses of § 1291. *Weyerhaeuser Co. v. International Longshoremen's & Warehousemen's Union, Local 21*, 733 F.2d 645 (9th Cir.1984). A consent decree is considered a final judgment despite the fact that the district court retains jurisdiction over the case. *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 674 F.2d 976, 981 (3d Cir.), *cert. denied*, 459 U.S. 905, 103 S.Ct. 206, 74 L.Ed.2d 165 (1982); *cf. United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1426 (10th Cir.1990) (order entered three years after consent judgment appealable because underlying controversy was concluded), *cert. denied*, —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991). Thus, the contempt order in this case is a post-judgment order because the parties agreed to the consent decree in 1982.

A post-judgment order imposing sanctions acquires the "operativeness and consequence" required for finality under § 1291. *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1145 (9th Cir.1983).[4] The plaintiffs claim that the district court's contempt order is not final because (1) sanctions will not be levied until the City violates the population limits, and (2) the Special Master failed to determine that a bona fide emergency beyond the control of the City exists.[5]

■ In this case, the sanctions are not speculative. The City has not been required to pay sanctions because of this court's stay of the district court's order.[6] The record demonstrates that the City is not in compliance with the population limits

---

**4.** When a contempt order threatens to impose sanctions to coerce compliance but the sanctions never actually are imposed because the party appeals before the sanctions accrue, the order is not final. *See Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 399 (5th Cir. 1987); *see also Donovan v. Mazzola (Donovan I)*, 761 F.2d 1411, 1416–17 (9th Cir.1985). This rule is inapplicable here because the fines would have begun accruing on January 1, 1992. The only reason the fines have not been levied is this court's temporary stay.

**5.** The consent decree provides that the Special Master can excuse non-compliance with the population limits if he determines that a bona fide emergency exists.

**6.** *Weyerhaeuser Co.*, 733 F.2d at 645 and *Hoffman v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268 (9th Cir.1976), both holding that speculative sanctions bar finality, are distinguishable. In *Hoffman*, the court held it did not have jurisdiction over an order that assessed fines but suspended them on the condition that they be purged. *Id.* at 1272. The district court's order in this case made no such condition. In *Weyerhaeuser*, the court dismissed the appeal because "further proceedings remain[ed] in the district court." *Weyerhaeuser Co.*, 733 F.2d at 646. Thus the order came within the general rule barring appeal of contempt orders when other proceedings are pending.

and thus would be required to pay the fines if the stay were not in effect. Hennessey Decl. in Support of Mot. for Stay ¶ 8 (Jan. 6, 1992). The fact that the exact amount of the fines is undetermined and ongoing does not make the sanctions speculative. *See Shuffler*, 720 F.2d at 1145; 9 James Wm. Moore et al., *Federal Practice* § 110.13[4], at 150 (2d ed. 1992) ("if the contempt judgment is entered in a post-final judgment proceeding, it is final and appealable, since there is no other judgment from which the appeal will lie"). Nor does the fact that the sanctions are conditional defeat the contempt order's finality. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 777 (9th Cir.1983) (sanctions paid but could be refunded with subsequent compliance). This situation is distinct from cases where the contempt order was not final because certain *compensatory* contempt sanctions had not yet been determined. *See American St. Gobain Corp. v. Armstrong Glass Co.*, 418 F.2d 571 (6th Cir. 1969).

As to the argument that the Special Master could excuse noncompliance, there is no evidence that the City would be excused for noncompliance. As the City points out, the emergency clause was meant to cover situations such as mass demonstrations, civil disobedience, or other events causing a large but temporary surge in the jail's population. Moreover, the City has made no effort to invoke this provision and nothing would require them to do so in order to make the district court's contempt order final for the purposes of § 1291.

■ Finally, pragmatic concerns cut in favor of finding the contempt order to be final. The Supreme Court has counseled a practical rather than a technical interpretation of § 1291. *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981); *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152–53, 85 S.Ct. 308, 310–11, 13 L.Ed.2d 199 (1964). The most important concerns

in determining § 1291 finality are "the inconvenience of piecemeal review on the one hand and the danger of denying justice by delay on the other." *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950). Allowing an appeal of Judge Orrick's order does not encourage piecemeal litigation. The consent decree is the equivalent of a final judgment; thus ongoing proceedings would not be disrupted by allowing an appeal of the contempt order. Moreover, treating the order as final avoids the danger of unjust delay.

Requiring the City to accrue large sums in sanctions before appealing the order, as the plaintiffs argue, belies common sense. The plaintiffs' rule would require the City to violate the order, pay the fines into the fund, and then comply with the decree's population limits to make the amount of fines certain before the City could appeal the contempt order. Under these circumstances, "both policy and common sense would dictate that we assume jurisdiction under the rule of *Gillespie....*" *Smith v. Eggar*, 655 F.2d 181, 184–85 (9th Cir.1981). Such a result comports with the realities of prison reform litigation: "[I]nstitutional reform litigation frequently requires that jurisdiction be retained long after the basic determination of liability. Just as appeal should be available from successive remedial orders, so should appeal be available from a finding of contempt when circumstances make it uncertain whether any further orders will be required." 15B Charles A. Wright et al., *Federal Practice and Procedure: Jurisdiction 2d* § 3917, at 397 (1992). This argument is especially persuasive where the contemnor is under the threat of continuing contempt as in this case.[7]

■ Although the issue was not raised by the parties, we also have jurisdiction to consider the federalism questions raised by the *amicus.* Issues touching on federalism and comity may be considered *sua sponte.*[8]

---

7. Because the order is final for purposes of § 1291, it is unnecessary to reach the City's claim under § 1292(a)(1).

8. Comity issues do not, however, present a jurisdictional bar. Thus the court does not have a duty, as it does with subject-matter jurisdiction, to consider such issues if not raised by the

In habeas corpus cases, for example, federal courts may consider *sua sponte* whether the defendant has exhausted state remedies, a question touching upon delicate issues of federalism. *See Granberry v. Greer,* 481 U.S. 129, 134, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987) (when state fails to raise nonexhaustion claim, "court should determine whether the interests of comity and federalism will be better served by addressing the merits forthwith or by requiring" further state proceedings); *see also Taylor v. Gilmore,* 954 F.2d 441 (7th Cir.1992) (applying *sua sponte* rule that federal courts will not correct errors of state criminal law in collateral proceedings), *petition for cert. filed,* 60 U.S.L.W. 3783 (U.S. Apr. 27, 1992) (No. 91–1738); *Fortino v. Quasar Co.,* 950 F.2d 389, 391 (7th Cir.1991) ("[c]omity ... accepted reason for an appellate court to consider issues that would otherwise have been deemed waived ..."); *Smith v. Moffett,* 947 F.2d 442, 445 (10th Cir.1991) (court of appeals has discretion to raise comity issues *sua sponte* ); *Thomas v. Indiana,* 910 F.2d 1413, 1415 (7th Cir.1990) ("delicate questions of comity can be raised on the court's own initiative"). The underlying principle in these cases logically extends to institutional reform litigation, especially where acts of the state legislature and judiciary are involved.

### B. The Contempt Order

■ The district court has "wide latitude in determining whether there has been a contemptuous defense of its order." *Gifford v. Heckler,* 741 F.2d 263, 266 (9th Cir.1984); *see Spallone v. United States,* 493 U.S. 265, 276, 110 S.Ct. 625, 632, 107 L.Ed.2d 644 (1990) (federal courts have inherent power to enforce their lawful orders

through contempt). This court reviews a district court's contempt finding and imposition of sanctions for abuse of discretion. *Diamontiney v. Borg,* 918 F.2d 793, 795 (9th Cir.1990); *In re Grand Jury Proceedings,* 914 F.2d 1372, 1373 (9th Cir.1990). Moreover, deference to the district court's exercise of discretion is heightened where the court has been overseeing a large, public institution for a long period of time. *Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, ——, 112 S.Ct. 748, 765, 116 L.Ed.2d 867 (1992) (O'Connor, J., concurring); *see also Hutto v. Finney,* 437 U.S. 678, 688, 98 S.Ct. 2565, 2572, 57 L.Ed.2d 522 (1978) (substantial deference given to district court's "years of experience with the problem at hand"). Such deference applies in this case because Judge Orrick has been involved with this case since 1978 and has overseen the implementation of the consent decree for nearly a decade.

This Circuit's rule with regard to contempt has long been whether the defendants have performed "all reasonable steps within their power to insure compliance" with the court's orders. *Sekaquaptewa v. MacDonald,* 544 F.2d 396, 404 (9th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977); *see also General Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir.1986).[9]

■ The City argues that its good faith efforts to comply with the provisions of the consent decree should excuse its noncompliance. The City, however, confuses the liability standards for Eighth and Fourteenth Amendment violations with applicable standards of review for contempt orders. Intent is irrelevant to a finding of civil contempt and, therefore, good faith is not a defense. *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Donovan I,* 716

---

parties. *See Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 16 n. 8, 107 S.Ct. 971, 976 n. 8, 94 L.Ed.2d 10 (1987) (exhaustion is comity principle, not a "jurisdictional prerequisite"); *see also Naranjo v. Ricketts,* 696 F.2d 83, 86 (10th Cir. 1982).

**9.** The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of

the court. *Balla v. Idaho St. Bd. of Corrections,* 869 F.2d 461, 466 (9th Cir.1989). The burden then shifts to the contemnors to demonstrate why they were unable to comply. *Donovan v. Mazzola (Donovan II),* 716 F.2d 1226, 1240 (9th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). They must show they took every reasonable step to comply. *Sekaquaptewa,* 544 F.2d at 406.

F.2d at 1240; *Toussaint v. McCarthy,* 597 F.Supp. 1427, 1430 (N.D.Cal.1984); *see also Fortin v. Commissioner of Mass. Dep't of Pub. Welfare,* 692 F.2d 790, 796 (1st Cir. 1982).

Recent Supreme Court cases do not change this standard. *Wilson v. Seiter,* — U.S. —, — – —, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991) held that plaintiffs must show prison officials showed "deliberate indifference" to prison conditions to establish an Eighth Amendment violation. This standard, however, is inapplicable here because the City has consented to improving the conditions in Jail No. 1,[10] and the City never has challenged or moved to modify the consent decree. Nor does the City argue that this appeal should be treated as a challenge to the consent decree.

In *Rufo,* 112 S.Ct. at 758, the Supreme Court established the standard to modify the terms of a consent decree based on changes in the law or facts and held that Rule 60(b) of the Federal Rules of Civil Procedure applies to such situations. The issue of what standard a court should use to determine whether a party is in contempt was not before the Court.[11] These recent Supreme Court cases do not speak directly to the issue before us and therefore do not disturb long-standing Ninth Circuit law.[12]

The City mischaracterizes the "every reasonable step" rule by asserting that it must consider every option that the court could conceive. The case that established the standard, *Sekaquaptewa* 544 F.2d at 396, makes no such suggestion. The *Sekaquaptewa* court held that the contemnors had failed to take "every reasonable step" to comply because there was "little consci-

entious effort on the part of the appellants to comply with those orders...." *Id.* at 406. More recent cases have held that "technical or inadvertent violations ... will not support a finding of civil contempt." *General Signal Corp.,* 787 F.2d at 1379.

▮ The district court considered two factors in determining that the City had not taken every reasonable step: (1) the City's history of noncompliance with the inmate population levels; and, (2) the failure to comply despite the pendency of the contempt motion. Over the nine years that the consent decree has been in effect, Jail No. 1's population level often has been above the prescribed limits. In fact, the jail had been overcrowded for eight months before the district court entered the contempt order. Moreover, the City in the past had failed to comply with other provisions of the consent decree such as those covering staffing, recreation, and medical and health care. Such evidence is highly relevant in finding the City in contempt. *See Balla,* 869 F.2d at 472 (historic failure to comply relevant in fashioning remedy). The City failed to comply with the consent decree despite the district court threat to impose harsh monetary sanctions. *See Toussaint,* 597 F.Supp. at 1430 (undisputed delay of eight months in obeying order "sufficient in itself to establish that respondents ... did not act with reasonable dispatch"). Against this background, the district court's finding that the City had not taken every reasonable step to comply with the consent decree was not an abuse of discretion.

The City argues that the recent upsurge in the jail population beginning in February was unforeseen. There is evidence, how-

---

**10.** Moreover, *Wilson* addressed claims by convicted prisoners, whereas the plaintiffs here are pretrial detainees who possess greater constitutional rights than prisoners. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979) (pretrial detainees may not be subject to "punishment"); *see also Redman v. County of San Diego,* 942 F.2d 1435, 1440 n. 7 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992).

**11.** As this court has noted, "[A] contempt proceeding does not open to reconsideration the

legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *Balla,* 869 F.2d at 465 (citation omitted).

**12.** Similarly, the defendants' reliance on *United States v. Michigan,* 940 F.2d 143 (6th Cir.1991) is misplaced. That court's analysis was based on the premise that the district court had *modified* the consent decree. *Id.* at 149–51. The City has not moved to modify the consent decree in this case.

ever, that the City should have known that the jail population was going to increase. The district court's factual findings are reviewed for clear error. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 689, 66 S.Ct. 1187, 1193, 90 L.Ed. 1515 (1946); *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1364 (9th Cir.1987). In 1989, the National Council on Crime and Delinquency published its report predicting that San Francisco's jail population would reach 2109 inmates per day by 1992. This figure is very close to the actual prison population today. Moreover, the Special Master predicted the population would be 2055 inmates per day. The only rebuttal offered by the City is hearsay evidence that was not part of the record below. Under these circumstances, the district court did not clearly err in finding that the jail population increases were foreseeable and that the City should have taken further steps to alleviate the overcrowding problem.[13]

■ The City challenges several of the district court's factual findings that supported its contempt order. Plaintiffs argue that the City has waived its objections to these findings by not contesting them when they were submitted by the Special Master as a part of his progress reports. We agree. The Special Master's progress reports were filed in accordance with Rule 53(e)(1) of the Federal Rules of Civil Procedure. The Special Master submitted drafts of the reports to the parties so that they could correct any factual errors. The City has never objected to any of these findings and thus has waived its right to object. *See Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir.1991); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir.1990); *Britt v. Simi Valley Unified School Dist.*, 708 F.2d 452, 454 (9th 1983).

Even if the City has not waived its objections, the court's findings are subject to a clear error test. *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d at 1364. Our review of the district court's findings does not lead us to conclude that the court committed clear error.

■ The City argues that it faces a financial crisis that prevents it from funding these programs, but federal courts have repeatedly held that financial constraints do not allow states to deprive persons of their constitutional rights. *See Toussaint v. McCarthy*, 801 F.2d 1080, 1110 (9th Cir. 1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *Lareau v. Manson*, 651 F.2d 96, 104 (2d Cir.1981); *Smith v. Sullivan*, 611 F.2d 1039, 1043–44 (5th Cir.1980); *Battle v. Anderson*, 564 F.2d 388, 396 (10th Cir.1977); *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir.1968).[14]

■ Finally, the City argues that it has spent thirty million dollars on programs to cope with the overcrowding program. While this demonstrates that the City has made efforts in the past to comply with the consent decree, it does not render the court's contempt order an abuse of discretion. The City was in violation of the decree for eight months before the court entered the contempt order. On many previous occasions, the population at Jail No. 1 exceeded its limits, and the court threatened the City with sanctions in order to obtain compliance. It had become obvious

---

13. The cases cited by the City, *Nelson v. Collins*, 659 F.2d 420 (4th Cir.1981) and *Thompson v. Enomoto*, 542 F.Supp. 768 (N.D.Cal.1982), are inapposite. In *Nelson*, the court applied a "good faith compliance" standard used by the Fourth Circuit, *Nelson*, 659 F.2d at 422, but this is not the law of this Circuit. Moreover, the increases in the prison population were due to unforeseen circumstances. *Id.* *Thompson* also involved unforeseeable increases in the prison population. *Thompson*, 542 F.Supp. at 770. Moreover, the court found that a contempt finding was unnecessary since the parties were willing to modify the consent decree, a situation that does not exist here. *Id.* As discussed, the standards in such a case are different than those applicable here.

14. The City's reliance on *Rufo* does not change the analysis: the first portion of the language that the City cites states that "financial constraints may not be used to justify the creation or perpetuation of Constitutional violations." *Rufo*, 112 S.Ct. at 764. While the Court goes on to state that financial constraints are an important interest to be considered, this is in the context of modifying the terms of a consent decree to meet unexpected or unanticipated circumstances that make compliance onerous, *id.*, a circumstance not present in this case.

that the City's plan to address the overcrowding problem was inadequate and that stronger measures were needed. It does not appear, nor does the City argue, that the sanctions themselves were too onerous as to be an abuse of discretion.

## C. Expanded Powers for the Sheriff

The City argued that it received inadequate notice and an opportunity to be heard before the district court gave the Sheriff the power to release inmates after they have served 50% of their sentences. The City therefore argues that this portion of the contempt order must be remanded.[15]

■ The added powers, however, only expanded the Sheriff's authority to comply with the consent decree. The contempt order did not alter the nature or scope of the population limits established in the consent decree. It therefore did not modify the decree because it did not change the underlying legal relationship between the parties. *See Sierra Club v. Marsh,* 907 F.2d 210, 212 (1st Cir.1990) (preliminary injunction not modified by subsequent order); *cf. Thompson v. Enomoto,* 815 F.2d 1323, 1327 (9th Cir.1987) (addition of special master did not modify consent decree).

15. The City concedes, however, that it had notice that the court may have expanded the Sheriff's powers to allow releases at 60% of time served because this recommendation was made in the Special Master's 14th Progress Report.

16. In addition to those provisions listed in note 1, the early-release provisions allowed the City to circumvent California Penal Code §§ 4024.1 and 827.1.

17. Nothing in any of the district court's orders directly authorizes the Sheriff to ignore actions of the state judiciary. The *amicus* argues that the court's override provisions impinge on state court sentences that rely on the penal code provisions that the Sheriff is authorized to disregard.

18. The *amicus* also argues that the appointment of a special master raises federalism concerns, but this claim does not deserve serious consideration. Federal courts repeatedly have approved the use of special masters to monitor compliance with court orders and consent decrees. *United States v. Michigan,* 940 F.2d at 157 (approving monitoring of state prisons while finding other portions of remedial scheme violated

■ Independently, the City received adequate notice of the changes. The City originally agreed to the early-release and state-law-override provisions in June 1987. The court expanded the early release provisions from 90% to 70% of time served in January 1988 without objection from the City. Moreover, the Special Master had recommended in his fourteenth progress report that the early-release provisions be expanded further. Finally, the City objected to the expansion of the early-release provisions at this hearing, and the court changed parts of the order based on these objections. Under these circumstances, the City had sufficient notice of the changes and an opportunity to be heard.

## D. Federalism

The *amicus* brief raises questions about the district court's orders empowering the Sheriff to release prisoners before they have served their entire sentences. The *amicus* argues that the early-release provisions impinge on the (1) state legislature's discretion to formulate criminal laws;[16] and, (2) on the state courts' ability to enforce these laws.[17] These two concerns implicate problems regarding the appropriate limits of federal equitable powers to enforce consent decrees.[18]

federalism principles); *Kendrick v. Bland,* 740 F.2d 432, 438 (6th Cir.1984) (court may appoint monitor to oversee compliance with valid federal court order); *Hoptowit v. Ray,* 682 F.2d 1237, 1263 (9th Cir.1982) (upholding appointment of special master to "monitor compliance" but not take control of prison); *Ruiz v. Estelle,* 679 F.2d 1115, 1161 (5th Cir.1982), *vacated in part on other grounds,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Campbell v. McGruder,* 580 F.2d 521, 544 (D.C.Cir.1978); *Miller v. Carson,* 563 F.2d 741, 753 (5th Cir.1977); *Newman v. Alabama,* 559 F.2d 283, 290 (5th Cir.1977) (monitors appointed with authority to observe but not to intervene in prison affairs); *Gates v. Collier* 501 F.2d 1291 (5th Cir.1974) (monitor appointed to ensure compliance with court orders); *Inmates of Attica Correctional Facility v. Rockefeller,* 453 F.2d 12, 25 (2d Cir.1971) (remanded to consider appointment of federal monitor).

The Special Master has no authority to interfere with the operation of the City's jails. The district court appointed the Special Master to investigate, report, and recommend actions that the City could take to ensure compliance with

The Supreme Court has recognized that "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976); *see also O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Milliken v. Bradley (Milliken I),* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

Article III extends the federal judicial power "to all Cases, in Law and Equity" that fall with certain categories. Equity jurisdiction "prescribes the body of doctrine which is to guide [federal courts'] decisions and enable them to determine whether in any given instance a suit ... is an appropriate one for the exercise of the extraordinary powers of a court of equity." *Atlas Life Ins. Co. v. W.I. Southern, Inc.,* 306 U.S. 563, 568, 59 S.Ct. 657, 660, 83 L.Ed. 987 (1939) (citations omitted). A federal court's decision to exercise its equity powers is based upon the "body of doctrine" that includes federalism concerns. *See* Alan Effron, *Federalism and Federal Consent Decrees Against State Governmental Entities,* 88 Colum.L.Rev. 1796, 1798–99 (1988). These considerations include comity and institutional competence. These concerns are highly contextual and must be evaluated on a case-by-case basis.

Justice Black described the comity interest in *Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971) as "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." He went on to explain that comity

> does not mean blind deference to 'States' Rights,' [but it] does represent ... a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal

rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Id.*

As comity relates to the reform of penal institutions, the Court has stated:

> It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.... The strong considerations of comity ... require giving the States the first opportunity to correct the errors made in the internal administration of their prison.

*Preiser v. Rodriquez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973).

██ The other concern is institutional competence. Federal courts are not in the business of running state penal institutions. Generally, federal courts properly defer to the policy decisions of prison officials who know best how to run correctional facilities. The Supreme Court has stated:

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security..

*Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878. Moreover, in prison reform litigation, federal courts must "craft remedies with extraordinary sensitivity," *Inmates of Occoquan v. Barry,* 844 F.2d 828, 844 (D.C.Cir. 1988), "tak[ing] into account the interests of state and local authorities in managing their own affairs." *Id.* at 841 (citations omitted). "[W]here federal constitutional rights have been traduced, [however,] principles of restraint, including comity, separation of powers and pragmatic caution dissolve...." *Duran v. Carruthers,* 678

the consent decree. The City agreed to his appointment.

F.Supp. 839, 847 (D.N.M.1988), *aff'd*, 885 F.2d 1485 (10th Cir.1989), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990). Nonetheless, federal courts should always seek to minimize interference with legitimate state activities in tailoring remedies.

### 1. Standard of Review

A federal court has broad equitable remedial powers. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *Hoptowit*, 682 F.2d at 1245. The court's choice of remedies is reviewed for an abuse of discretion. *Id.* at 1245–46.[19]

In employing their broad equitable powers, federal courts should "exercise the least possible power adequate to the end proposed." *Spallone*, 493 U.S. at 280, 110 S.Ct. at 634 (citations omitted); *Hoptowit*, 682 F.2d at 1247; *see also United States v. Michigan*, 940 F.2d at 167; *Newman v. Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983).

Courts have conceded, however, that when the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable. *Spallone*, 493 U.S. at 280, 110 S.Ct. at 634 (if sanctioning city failed to induce compliance, court could consider sanctioning individual council members); *Hutto*, 437 U.S. at 688 n. 9, 98 S.Ct. at 2572 n. 9 (when state and local authorities fail to rectify a wrong, federal court may invoke its broad equity powers to remedy the situation); *Ruiz*, 679 F.2d at 1145–46 ("the remedy should begin with what is absolutely necessary. If those measures later prove ineffective, more stringent ones should be considered").

While there are federalism concerns in institutional reform litigation involving correctional facilities, they do not automatically trump the powers of the federal courts to enforce the Constitution or a consent decree. The *amicus* misstates the law when he argues that federal courts lack authority to employ the early-release and state-law-override mechanisms. The scope of the district court's power to fashion equitable remedies is highly contextual and fact dependent. One simply cannot state that there is *no* case in which the remedial scheme taken in this case is appropriate. The proper question is whether it is appropriate under the facts presented.

### 2. Discussion

Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights. *Hutto*, 437 U.S. at 687 n. 9, 98 S.Ct. at 2572 n. 9; *Milliken v. Bradley (Milliken II)*, 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977). "[T]he lower courts have learned from repeated investigation and bitter experience that judicial intervention is *indispensable* if constitutional dictates—not to mention considerations of basic humanity—are to be observed in the prisons." *Rhodes v. Chapman*, 452 U.S. 337, 353–54, 101 S.Ct. 2392, 2402–03, 69 L.Ed.2d 59 (1981) (Brennan, J., concurring) (footnotes omitted); *see also Smith*, 611 F.2d at 1044 ("the federal courts have the power, and the duty, to make their intervention [into operation of prisons] effective").[20]

---

**19.** An abuse of discretion occurs when "no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found." *Duran v. Elrod*, 713 F.2d 292, 297 (7th Cir.1983) (citation omitted), *cert. denied*, 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1984).

**20.** The City argues that the scope of a federal court's equitable powers is narrower when the case involves a consent decree rather than a constitutional wrong. For a constitutional violation the text of the Constitution determines the appropriate standard of conduct. The standard for enforcing the consent decree, however, is determined by the terms of the agreement, much like a contract. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984) ("the 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it'") (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971)).

The consent decree in this case states that "this Decree does not constitute evidence or admission of liability of any party as to any issue of law or tort raised by the Com-

■ Moreover, in a line of cases relevant here, the Supreme Court has stated that otherwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme. In the school desegregation area, the Supreme Court has stated, "[S]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees." *North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971).

In *Missouri v. Jenkins*, 495 U.S. 33, 57, 110 S.Ct. 1651, 1666, 109 L.Ed.2d 31 (1990), another case involving school desegregation, the Court held, "Even though a particular remedy may not be required in every case to vindicate constitutional guarantees, where (as here) it has been found that a particular remedy is required, the State cannot hinder the process by preventing a local government from implementing that remedy." [21] In *Jenkins*, the district court had ordered that local taxes be raised in order to fund the desegregation plan. The court of appeals rejected this provision of the district court's order, but held that the court could empower the state tax assessor to raise the taxes in spite of state law that forbade the action. The Supreme Court upheld this latter exercise of federal equitable power, while invalidating the former. *Jenkins*, 495 U.S. at 51, 110 S.Ct. at 1663.

In distinguishing the two approaches, the Court held:

plaint...." Consent Decree ¶ I.B., at 2. It also states that "defendants do not admit to any violations of or failure to comply with applicable laws, rules or regulations, nor do defendants admit to any violation of constitutional standards." *Id.* ¶ II.B., at 2. The City therefore argues that the Sheriff's early-release authority cannot be justified as an exercise of the district court's authority to remedy constitutional violations. They argue that no constitutional violation exists here because over-crowding is not *per se* unconstitutional absent an explicit finding by the district court to this effect. *See Hoptowit*, 682 F.2d at 1249. Pretrial detainees cannot be confined in conditions that amount to punishment because they have not been convicted of any crime. *Wolfish*, 441 U.S. at 535 n. 16, 99 S.Ct. at 1872 n. 16; *Redman*, 942 F.2d at 1440 n. 7. Overcrowding of pretrial detainees has been held unconstitutional. *Inmates of Allegheny County Jail v. Wecht*, 754 F.2d 120, 127 (3d Cir.1985). While there may have been a constitutional violation in this case, the district court did not make such a finding.

Even if no constitutional wrong exists, it does not necessarily follow that the federal court's power to enforce the consent decree is somehow lessened. The Court held in *Local Number 93, International Association of Firefighters v. City of Cleveland*, 478 U.S. 501, 525, 106 S.Ct. 3063, 3076, 92 L.Ed.2d 405 (1986) that a remedial scheme embodied in a consent decree may be broader than that which a federal court could award after a trial on the merits. Moreover, several courts have held that federalism concerns do not prevent a federal court from enforcing a consent decree to which state officials have consented. *See United States v. City of Yonkers*, 856 F.2d 444, 454 (2d Cir.1988), *rev'd in part on other grounds sub nom. Spallone v. United States*, 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990); *Allen v. Alabama State Bd.*

of *Educ.*, 816 F.2d 575, 577 (11th Cir.1987); *United States v. District of Columbia*, 654 F.2d 802, 808 & n. 11 (D.C.Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981). The City argues that they did not consent to the final expansion of the Sheriff's authority that is on appeal here, but they did consent to the initial early-release authority and the first expansion that allowed the Sheriff to disregard applicable state laws.

The City does not provide an alternative standard by which to evaluate the district court's ability to enforce a consent decree. We hesitate to follow those cases that hold that the state waives federalism objections when it enters a consent decree because the state actors involved in this case have not clearly consented to the federalism intrusions. We discern no reason, however, to treat this case differently from one based upon a finding of constitutional wrong. In *Badgley v. Santacroce*, 800 F.2d 33, 38 (2d Cir.1986) (footnotes omitted), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987), a case with facts similar to those here, the court stated:

The respect due the federal judgment is not lessened because the judgment was entered by consent. The plaintiffs' suit alleged a denial of their constitutional rights. When the defendants chose to consent to a judgment, rather than have the District Court adjudicate the merits of the plaintiffs' claims, the result was a fully enforceable federal judgment that overrides any conflicting state law or state court order. The strong policy encouraging settlement of cases requires that the terms of a consent judgment ... be respected as fully as a judgment entered after trial.

**21.** *See also Badgley*, 800 F.2d at 38 (state law does not prevent federal court enforcement of consent decree in prison overcrowding case).

The difference between the two approaches [to impose the tax increase] is far more than a matter of form. Authorizing and directing local government institutions to devise and implement remedies not only protects the function of those institutions but ... also places the responsibility for solutions to the problems of segregation upon those who have themselves created the problems.

*Id.*

In this case Judge Orrick gave the City several opportunities to comply with the consent decree. Before the district court initially ordered the early-release and citation-release provisions, the City had not complied with the population levels established by the consent decree for over a year. In April 1987, the court postponed contempt sanctions to allow the City to create a plan to cure overcrowding problems that had persisted since mid–1985. In June, the court granted the Sheriff early-release authority, but by November the court issued an order to show cause why the City should not be held in contempt because Jail No. 1 remained overcrowded.

In January 1988, the district court found "egregious overcrowding" in Jail No. 1 and expanded the early-release provisions because the City still could not present a plan to cope with overcrowding. From that time until late 1988, the court deferred ruling on the pending contempt motion to allow the City adequate time to formulate a plan to address the problem.

The City complied with the consent decree's population levels in March 1989 under the threat of contempt fines, but soaring population levels forced the plaintiffs to move for contempt again in May 1991. This time the court gave the City nearly nine months to comply before further expanding the early-release provisions and ultimately holding the City in contempt.

On each occasion that the district court granted the Sheriff early-release authority or expanded this authority, the City was given the opportunity to comply or develop a comprehensive plan to comply. In each case the City failed to develop a plan to alleviate overcrowding. Notably, the district court never ordered the City to take any particular steps to solve the problem. Instead the court allowed the City to consider the Special Master's recommendations and formulate its own plan. Such a course of action was consistent with comity and institutional competence concerns that delimit the exercise of the court's equitable discretion. It also was consistent with the principle that the federal courts "exercise the least possible power adequate to the end proposed." *Spallone,* 493 U.S. at 280, 110 S.Ct. at 634.

Against this background the initial early-release and citation-release provisions were valid exercises of federal authority. The City originally agreed to the grant of early-release authority in June 1987. The district court's order allowed the Sheriff to release misdemeanants who had served ninety percent of their sentences. This provision did not allow the Sheriff to override applicable state laws because the Sheriff was able to place inmates in incarceration alternative programs such as work furloughs.

The Sheriff was not required to exercise his authority to release inmates; he could exercise the authority as he determined was necessary. In this sense, the early-release provision was an attempt to respect the institutional competence of prison administrators and minimize intrusion upon their authority.[22] *Cf. Jenkins,* 495 U.S. at 51, 110 S.Ct. at 1663 (authorizing local authorities to implement remedies less intrusive than ordering them to do so directly).

After state court sentences began making inmates ineligible for these programs, the court ordered the state-law-override

**22.** The *amicus* points out that the use of the early-release authority has created a threat to public safety. This threat was minimized by placing the authority to release prisoners early in the Sheriff's hands. The Sheriff possesses the expertise to determine which prisoners are suitable for early release. The Sheriff could determine that no prisoners should be released because of the threat to public safety. The court's action was consistent with the principle that federal courts should defer to the administrative expertise of prison officials. Moreover, the studies cited by the *amicus* do not involve cases where the court has placed the authority in the hands of prison officials to make early release, and that the declarations submitted by the City on this issue have not been reviewed by the district court.

provisions. Before granting the authority to the Sheriff, the court had both parties brief the issue of whether it had the power to allow the Sheriff to disregard state laws. It was not an abuse of discretion for the district court to pursue this approach after the City failed to solve the problem on its own. *Hutto,* 437 U.S. at 687, 98 S.Ct. at 2571 (approving highly intrusive remedy after prison officials failed to comply with previous orders); *see also Hoptowit,* 682 F.2d at 1247; *Toussaint v. Yockey,* 722 F.2d 1490, 1494 (9th Cir.1984). The federalism concerns were minimal because the court was not "restructur[ing] local governmental entities," *Milliken II,* 433 U.S. at 291, 97 S.Ct. at 2763, nor otherwise allocating authority to one branch of government when the state had chosen to allocate that authority to another, since the original provision did not allow the Sheriff to override state law. Moreover, the court had given the City repeated opportunities to develop a plan to solve the overcrowding problem. The only viable alternative at that point was to hold the City in contempt and impose drastic fines.

 The court's expansion of the Sheriff's early-release authority to override applicable state law, however, presents a different case. The state-law-override provisions raise strong federalism concerns because the district court's action effectively reallocated legislative power to the executive.[23]

The City, relying on *Spallone,* somewhat ironically argues that contempt sanctions are a less intrusive alternative to rearranging the structure of state government via the state-law-override provisions. This argument has some appeal where the federalism concerns are great, a previous threat of contempt sanctions induced compliance in March 1989, and the fines would be held in a special City fund to pay for solutions to the overcrowding problem. Thus the

court should have waited until the threat of sanctions failed to induce compliance before authorizing the state-law-override provisions.

Furthermore, the district court did not make any findings that other alternatives were inadequate before it authorized the Sheriff to override applicable state laws. Such findings are essential for any grant of authority to be "least possible power to the end proposed." *Spallone,* 493 U.S. at 280, 110 S.Ct. at 634.

The most recent expansion of the early-release provisions at issue in this appeal possesses the same infirmities. The court expanded the Sheriff's powers when it held the City in contempt, but did not wait to see if the threat of sanctions would induce compliance.[24] Moreover, the City states that it was investigating the availability of jail space in other counties. As with the previous order, the district court should have made findings that these alternatives were inadequate before authorizing any further override provisions. Absent such findings, the state-law-override provisions cannot be considered the option least intrusive on the operation of state government.

 While we hold that the district court went too far under these circumstances in allowing the Sheriff to override state laws and state court sentences, we do not rule out the possibility that such action may be necessary in the future. *See Plyler v. Evatt,* 924 F.2d 1321, 1329 (4th Cir. 1991) (refusing to rule out possibility that court might order early release to meet consent decree). If the threat of contempt sanctions proves ineffective and if the district court finds that other alternatives are inadequate, the court could consider authorizing the Sheriff to override certain provisions of state law to assure compliance. *See Jenkins,* 495 U.S. at 57, 110 S.Ct. at

---

**23.** While the Sheriff may have chosen not to exercise that authority, thus lessening somewhat the intrusion on state activities, the effect of the action, whether the Sheriff exercises the power or not, is at odds with state law. *See* n. 3 *supra* (citing provisions overridden by district court's order.) It is the judiciary, not the Sheriff, that is responsible for imposing criminal sentences. *See In re Lynch,* 8 Cal.3d 410, 105 Cal.Rptr. 217, 221, 503 P.2d 921, 925 (1972) (citation omitted).

**24.** The plaintiffs argue that the release powers only could be used as a last resort, but this language does not apply to the override provision. Thus, the City correctly argues that the Sheriff was authorized to release inmates "regardless of whether doing so is necessary to assure compliance."

1666; *Swann,* 402 U.S. at 45, 91 S.Ct. at 1285; *Badgley,* 800 F.2d at 38. In any event, the district court should tailor the grant of such authority as narrowly as possible so as to minimize the intrusion upon the state's affairs. At a minimum, the court should give the Sheriff override authority only as a last resort and only as essential to achieve compliance with the consent decree.

### III. CONCLUSION

The district court's finding of contempt is AFFIRMED. That portion of its order allowing the Sheriff to override applicable state law in conducting early release or placing prisoners in alternative programs listed in note 3, *supra,* is VACATED, and the remainder of the order is AFFIRMED.

The parties shall bear their own costs on this appeal.

### ORDER

Aug. 25, 1992.

The panel which heard this case has unanimously voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc.

However, the panel proposed an amendment of the Opinion filed herein on June 25, 1992, and circulated the proposed amendment to the full court. No judge of the court has requested a vote on the suggestion for rehearing en banc after considering the proposed amended Opinion. Fed. R.App.P. 35.

WHEREFORE, it is ordered that Part III. CONCLUSION of the Opinion, p. 865, filed on June 25, 1992, amended July 9, 1992, is further amended to read as follows:

[Editor's Note: Opinion corrected for publication.]

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED, and

Appellees' motion to issue mandate or in the alternative to lift stay is DENIED as moot.