181 P.3d 887 (2008)
STATE of Washington, Respondent,
v.
Kelley A. WILSON, Appellant.
No. 24578-1-III.
Court of Appeals of Washington, Division 3.
April 24, 2008.
*888 Mark A. Larranaga, Walsh & Larranaga, Rita Joan Griffith, Attorney at Law, Seattle, WA, for Appellant.
Benjamin Curler Nichols, Asotin County Prosecutor's Office, Asotin, WA, for Respondent.
KULIK, J.
¶ 1 The State charged Kelley Wilson with felony murder and burglary. Burglary, based on the violation of a restraining order, was the predicate felony. Ms. Wilson committed the burglary by entering and remaining in the home of Charles E. Thrush, Jr., in violation of a restraining order. When Mr. Thrush arrived at the home, an argument ensued, and Ms. Wilson stabbed Mr. Thrush. Later, Mr. Thrush died.
¶ 2 The principal issue presented in this appeal is whether the trial court committed reversible error by admitting evidence under ER 404(b) of the prior bad acts by Ms. Wilson against Mr. Thrush and evidence of her intent to kill him. Intent is not an element of felony murder. However, the trial court allowed the State to present the ER 404(b) evidence in the event the State sought to amend the felony murder charge to a crime requiring intent later during the trial. The State did not amend the information.
¶ 3 We hold that the trial court erred by admitting the evidence of Ms. Wilson's prior bad acts and evidence of intent to kill. We conclude that the admitted evidence of prior bad acts was of a highly prejudicial nature and was not harmless. Additionally, because intent is not an element of felony murder, the prior bad acts were not relevant. Accordingly, we reverse and remand for a new trial.

*889 ASSIGNMENTS OF ERROR
¶ 4 On appeal, Ms. Wilson contends the trial court (1) impermissibly delayed appointing experienced trial counsel, (2) denied Ms. Wilson's right to effective assistance of counsel by requiring defense counsel to bring funding motions in open court, (3) denied her right to appear and right to effective counsel by allowing the State to provide untimely discovery, (4) allowed proceedings to occur while Ms. Wilson's competence was still at issue, (5) failed to determine the existence of a conflict, (6) failed to suppress Ms. Wilson's pretrial statement, made after her request for an attorney, (7) erred when applying the anti-merger doctrine and the same criminal conduct test, (8) violated Ms. Wilson's right to a public trial, (9) erred by allowing the State to present evidence of intent to kill, and (10) erred by denying Ms. Wilson's jury instructions as to self-defense and battered woman's syndrome.
¶ 5 Ms. Wilson asserts the prosecutor: (11) committed misconduct in his opening statement, (12) committed misconduct by allowing a witness to give perjured testimony, (13) violated Ms. Wilson's double jeopardy rights by arguing that Ms. Wilson committed burglary by violating two alternative provisions of the no-contact order, (14) impermissibly commented on Ms. Wilson's right to remain silent, and (15) impermissibly commented on Ms. Wilson's guilt.
¶ 6 Ms. Wilson also argues that (16) a State's witness impermissibly commented on her guilt, and that the trial court violated Ms. Wilson's constitutional right to a public trial when it conducted voir dire in a closed jury room. Finally, Ms. Wilson argues that the cumulative effect of numerous errors resulted in the denial of a fair trial.

FACTS
¶ 7 Kelley Wilson had a long-term relationship with Charles E. Thrush, Jr. The couple had two children together. In 2004, the relationship ended and Mr. Thrush began dating Teena Arthur. Mr. Thrush rented the ground floor of a house on Florence Lane in Clarkston, Asotin County. His landlord lived directly behind him.
¶ 8 In January 2005, Ms. Wilson was arrested for fourth degree assault-domestic violence against Mr. Thrush. The court ordered Ms. Wilson to have no contact with Mr. Thrush and to stay away from his residence. Ms. Wilson signed the bond order promising to obey these conditions. Two weeks later, Ms. Wilson was arrested for fourth degree assault-domestic violence against Mr. Thrush. She signed a bond order again agreeing to have no contact with Mr. Thrush and to stay away from his residence.
¶ 9 While incarcerated, Ms. Wilson talked with her cellmate, Stefanie Floch. When Ms. Floch asked Ms. Wilson if she felt bad about abusing Mr. Thrush, Ms. Wilson said no. On February 17, 2005, the night before she was released from jail, Ms. Wilson told Ms. Floch that she was going to stab Mr. Thrush to death. Ms. Wilson stated that she wanted to kill him because he had taken money from her and because she wanted to be with another man.
¶ 10 On March 4, 2005, Ms. Wilson went to Ms. Arthur's residence to ask Mr. Thrush for money to get the electricity turned on at the house on Florence Lane. The electricity had been turned off and their two daughters, whom Mr. Thrush was caring for, were staying there. Mr. Thrush refused to give Ms. Wilson money. However, Ms. Wilson paid the power bill and the electricity was turned on. She returned to Mr. Thrush's house, washed dishes, and cleared out bags full of garbage.
¶ 11 Ms. Wilson's friend, Jorita Crice, was also at Mr. Thrush's house. After Ms. Crice left to make a phone call, Mr. Thrush arrived home. Mr. Thrush went to his bedroom. Ms. Wilson ordered Mr. Thrush out of his house and then went into the kitchen. When Mr. Thrush followed, she picked up a knife and told him that, "`If you don't leave me alone, I will stab you.'" Report of Proceedings (RP) (Aug. 31, 2005) at 734. She then stabbed him. The medical examiner testified that the stab wound penetrated five inches deep. The knife went into Mr. Thrush's heart, passing through the left ventricle, and through the front of the lower left ventricle, *890 and almost through the back wall of the lower left ventricle.
¶ 12 Ms. Wilson ran to the neighbor's house to find Ms. Crice. Ms. Wilson told Ms. Crice that she had stabbed Mr. Thrush. Meanwhile, Mr. Thrush staggered to his landlord's house and collapsed saying, "`Kelley stabbed me in the heart.'" RP (Aug. 30, 2005) at 318. Mr. Thrush was pronounced dead at the hospital.
¶ 13 Ms. Crice and Ms. Wilson left the scene and drove out to a farm where they hid Ms. Wilson's blood-stained dress. Then they drove to Pomeroy. While they drove, Ms. Wilson asked Ms. Crice to hit her and to make bruises to show that Ms. Wilson acted in self-defense. In Pomeroy, they went to Billy Gillum's house. They told him that Ms. Wilson had stabbed her boyfriend. Police arrested Ms. Wilson for homicide. When arrested, Ms. Wilson told the officers that "[s]he didn't mean to hurt anybody." RP (Aug. 30, 2005) at 432. Ms. Wilson was transported to the Garfield County Jail.
¶ 14 When interviewed by police, Ms. Wilson described a struggle in the bedroom where Mr. Thrush tried to smother her with a pillow. Ms. Wilson told police that Mr. Thrush had choked her until she was almost blacked out. However, there was no evidence that Ms. Wilson had been strangled. And police investigating the crime scene found no sign of a struggle in Mr. Thrush's bedroom.
¶ 15 When Ms. Wilson began talking about the kitchen, she made a reference to an attorney and the interview was terminated. Later, police learned that Mr. Thrush had died. Believing Mr. Thrush was married to Ms. Wilson, an officer gave Ms. Wilson a "death notification" that her husband had died. RP (Aug. 25, 2005) at 51. Ms. Wilson collapsed and said, "`I didn't mean to kill him. I didn't mean to stab him.'" RP (Aug. 25, 2005) at 51.
¶ 16 At the Garfield County Jail, Ms. Wilson was placed in a holding cell with Juanett Nichols. When Ms. Nichols asked Ms. Wilson why she was in jail, "[Ms. Wilson] said that she killed her boyfriend." RP (Aug. 31, 2005) at 575. Ms. Wilson also stated that when her boyfriend came into the kitchen, she "just wanted him to leave her alone" and to stop playing games with her head. RP (Aug. 31, 2005) at 580. Ms. Wilson told Ms. Nichols that she did not mean to kill him; she just wanted him to leave her alone.
¶ 17 Ms. Wilson was transported to the Asotin County Jail and booked on murder charges. A jury convicted Ms. Wilson of first degree burglary and first degree felony murder, predicated on the burglary charge.
¶ 18 At trial, Dr. Gregory Wilson,[1] a psychologist, testified that Ms. Wilson suffered from post-traumatic stress disorder, depression, anxiety, and a possible personality disorder. He explained that these disorders would cause Ms. Wilson to react differently to a perceived threat. During his session with Ms. Wilson, Ms. Wilson told him that she ordered Mr. Thrush out of his house, Mr. Thrush slapped her, and when she locked him out, he climbed in the window. He then slapped her, knocked her on the bed, and tried to smother her with a pillow. Ms. Wilson walked into the kitchen and Mr. Thrush followed. She warned Mr. Thrush that she would stab him if he did not leave her alone. When he approached her, she stabbed him.
¶ 19 Sergeant Thomas White testified that he helped process the crime scene. He observed various items on Mr. Thrush's bed and noted that the bed showed no sign of a struggle. A forensic technician testified that there was blood in the kitchen and shoeprints that matched those of Ms. Crice. The technician offered the opinion that the stabbing took place in the kitchen with the knife found in the sink. Another expert testified that the DNA[2] evidence revealed that at least three samples were obtained from the handle of the knife and that Ms. Crice and Ms. Wilson were possible donors.
¶ 20 Ms. Wilson was sentenced to 30 months for first degree burglary, 312 months for murder, with a 24-month enhancement for each crime. Ms. Wilson appeals.

*891 ANALYSIS
¶ 21 A. Prior Bad Acts. Under ER 404(b), evidence of other crimes, wrongs, or acts by the defendant are not admissible to show that it is likely the defendant committed the alleged crime, or acted in conformity with the prior bad acts when committing the crime, or had a propensity to commit the crime. State v. Lough, 125 Wash.2d 847, 852-53, 889 P.2d 487 (1995).
¶ 22 The State charged Ms. Wilson with felony murder in the first degree with burglary as the underlying predicate. Intent is not an element of felony murder. State v. Dennison, 54 Wash.App. 577, 580-81, 774 P.2d 1237 (1989), aff'd, 115 Wash.2d 609, 801 P.2d 193 (1990).
¶ 23 "A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person." RCW 9A.52.020(1). "[T]he Legislature has adopted a permissive inference to establish the requisite intent whenever the evidence shows a person enters or remains unlawfully in a building." State v. Grimes, 92 Wash.App. 973, 980 n. 2, 966 P.2d 394 (1998) (citing RCW 9A.52.040).
¶ 24 The State's theory was that Ms. Wilson committed burglary by (1) entering and remaining on the Florence Lane premises, and (2) contacting Mr. Thrush in violation of restraining orders. At trial, the State argued that evidence of intent to kill was admissible (1) because a higher showing of mens rea would prove a lower level of mens rea, and (2) because the State had the ability at trial to amend the information to include intentional murder. The State also asserted that evidence establishing Ms. Wilson's intent to assault or kill Mr. Thrush was admissible to prove the intent requirement for burglary. The court allowed evidence of intent to kill in the event the State decided to amend the charges during trial. Ultimately, the State did not amend the information to include intentional murder.
¶ 25 A criminal defendant has the right to be informed of the nature and cause of the charge against him or her. U.S. CONST. amend. VI; CONST. art. I, § 22 (amendment 10). A defendant must be informed of all the elements of the charges so that the defendant can prepare for trial and is not tried for an uncharged offense. State v. Vangerpen, 125 Wash.2d 782, 787-88, 888 P.2d 1177 (1995).
¶ 26 Under ER 404(b), an individual's prior crimes, wrongs, or acts are inadmissible to determine the individual's character or propensities. However, such acts may be admissible to show intent. ER 404(b) is read in light of ER 401, ER 402, and ER 403. State v. Smith, 106 Wash.2d 772, 775, 725 P.2d 951 (1986). ER 402 prohibits the admission of evidence that is not relevant. ER 401 defines "relevant evidence" as: "[E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 403 requires the exclusion of evidence, even if relevant, if its probative value is substantially outweighed by the danger of unfair prejudice.
¶ 27 When determining whether evidence of prior crimes, wrongs, or acts was properly admitted, the court must first determine whether the evidence is logically relevant to prove an essential element of the crime charged, rather than to show the defendant had a propensity to act in a certain manner. Second, the court must determine whether the evidence of these acts is legally relevant; that is, whether the probative value of the evidence is substantially outweighed by its prejudicial effect. Third, if the evidence is admitted, the court must instruct the jury as to the limited purpose for which it may be considered. State v. Saltarelli, 98 Wash.2d 358, 362-63, 655 P.2d 697 (1982). It is unclear from the record whether the court conducted the four-step inquiry required by Lough. Lough, 125 Wash.2d at 853, 889 P.2d 487.
¶ 28 The court's ruling on ER 404(b) evidence is reviewed for an abuse of discretion. In close cases, the balance must be *892 tipped in favor of the defendant. Smith, 106 Wash.2d at 776, 725 P.2d 951.
¶ 29 As a result of the trial court's decision to allow evidence as to intent to kill, the State was allowed to introduce evidence of prior assaults between Ms. Wilson and Mr. Thrush, Ms. Wilson's prior arrest, alleged statements to jail-house informants in which Ms. Wilson described her desire to get even with Mr. Thrush, the lack of evidence of a struggle, and references to Dr. Wilson's interview of Ms. Wilson.
¶ 30 We conclude the court abused its discretion by allowing this evidence of bad acts and intent to kill. Ms. Wilson conceded that she was in the house on Florence Lane in violation of a restraining order. The evidence of her prior bad acts or her intent to kill was highly prejudicial. Intent is not an element of felony murder. The court erred by allowing the State to present evidence of prior bad acts under the theory that the State might amend the charges at some time during the trial to a crime requiring proof of intent.
¶ 31 An erroneous ruling is not reversible error unless the court determines that, "`within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" Smith, 106 Wash.2d at 780, 725 P.2d 951 (quoting State v. Cunningham, 93 Wash.2d 823, 831, 613 P.2d 1139 (1980)). Improper admission of evidence constitutes harmless error if the evidence is of minor significance when compared with the evidence as a whole. State v. Neal, 144 Wash.2d 600, 611, 30 P.3d 1255 (2001).
¶ 32 We conclude that the admitted evidence is of a highly prejudicial nature, was not harmless, and, thus, requires a new trial.
¶ 33 B. Appointment of Counsel. On March 7, 2005, the court appointed Jane E. Richards, the public defender for Asotin County, to represent Ms. Wilson. On March 15, 2005, Ms. Richards asked the court to appoint co-counsel or lead counsel because Ms. Richards had only been a member of the bar for two years; she had no felony trial experience; and she did not have the experience to be sole counsel. Ms. Richards explained that there were many decisions to be made regarding the investigation and the examination of evidence.
¶ 34 The court acknowledged that Ms. Richards was "green behind the gills," but the court felt that Ms. Richards was qualified to proceed. RP (Mar. 22, 2005) at 5. The court suggested that Ms. Richards should brainstorm with someone who had more trial experience. The court denied the motion expressing concern for the "thousands upon thousands upon thousands of dollars" Asotin County would have to pay if experienced counsel was appointed. RP (Mar. 22, 2005) at 7. The court refused to place this burden on county taxpayers.
¶ 35 Five months later, on August 1, Ms. Richards filed a motion to withdraw based largely on the court's denial of the motion for co-counsel. She stated that she was "overwhelmed and unable to shoulder this burden alone." Clerk's Papers (CP) at 107. Ms. Richards explained that she did not have the resources or the experience to deal with a case of this size. Ms. Richards spent a large portion of her nine-page affidavit detailing the difficulties she had encountered in her attempt to view evidence, preserve the crime scene, and obtain lab reports. Ms. Richards concluded that under these circumstances, her client could not get a fair trial.
¶ 36 On August 8, the court, sua sponte, brought up the motion for the appointment of co-counsel. The court stated that it had contacted Scott Gallina for appointment as lead defense counsel. However, Mr. Gallina was out of state, and he would not return until August 12. Ms. Richards expressed her client's concern about her right to a speedy trial and the late appointment of lead counsel.
¶ 37 On August 15, defense counsel Ms. Richards and Mr. Gallina met for the first time. The court asked whether Mr. Gallina would be prepared for trial in 11 days. Mr. Gallina expressed his reservations, which were based on the outstanding discovery. And he expressed concern that Ms. Wilson might have to choose between adequate trial preparation and her speedy trial rights.
*893 ¶ 38 The day before trial, Mr. Gallina stated:
As the court is aware, I first saw this case on the 15th of August. That hasn't afforded me a great deal of time to make defense decisions and to marshal my defense witnesses. I've tried to do so as quickly as possible.
Dr. Wilson was one of those decisions that was made in the very short interim I've had between the time that I first appeared on this, and the time that I am sitting before you now.
RP (Aug. 25, 2005) at 13-14.
¶ 39 Ms. Wilson contends the court's initial decision not to appoint experienced trial counsel was based on budgetary concerns in violation of her right to the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and article I, section 22 (amendment 10) of the Washington Constitution. Ms. Wilson asserts that a defendant's right to representation should not depend on where he or she lives. Ms. Wilson asserts that the court's appointment of experienced counsel days before trial also violated her right to effective assistance of counsel.
¶ 40 A claim of ineffective assistance of counsel is a question of law reviewable de novo. State v. White, 80 Wash.App. 406, 410, 907 P.2d 310 (1995). To establish a claim of ineffective assistance of counsel, Ms. Wilson must show (1) her attorney's performance fell below an objective standard of reasonableness, and (2) resulting prejudice. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. In re Pers. Restraint of Pirtle, 136 Wash.2d 467, 487, 965 P.2d 593 (1998).
¶ 41 Based on this record, the court did not initially assign an experienced attorney due to budgetary reasons. Arguably, Ms. Richards was too inexperienced to try Ms. Wilson's case. Ms. Richards had never tried a felony case, much less a murder case. When Ms. Richards again raised the issue of her inexperience and tried to withdraw, the court relented. Eighteen days before trial, the court appointed Mr. Gallina as co-counsel.
¶ 42 The right to effective assistance of counsel includes a reasonable time for counsel to consult and prepare. State v. Hartzog, 96 Wash.2d 383, 402, 635 P.2d 694 (1981). "`[C]ounsel must, at a minimum, conduct a reasonable investigation enabling [counsel] to make informed decisions about how to best represent [the] client.'" In re Pers. Restraint of Brett, 142 Wash.2d 868, 873, 16 P.3d 601 (2001) (alternations in original) (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994)). Moreover, financial concerns should not be used as a justification for inhibiting the constitutional rights of criminal defendants. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 392, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); Stone v. City & County of San Francisco, 968 F.2d 850, 858 (9th Cir.1992).
¶ 43 Because we conclude in our ER 404(b) analysis that a new trial is required, we do not reach the issue of whether the defendant has shown ineffective assistance of counsel. We note, however, that the trial court should consider only relevant factors in the appointment of counsel.
¶ 44 C. Conflict of Interest. On August 8, 2005, the trial court, the prosecutor, and defense counsel, Ms. Richards, discussed the appointment of codefense counsel, Mr. Gallina. The court brought up the matter of appointment of counsel sua sponte and the court stated that it had contacted Mr. Gallina ex parte for the appointment. Ms. Richards informed the court that she believed Mr. Gallina had a conflict because he had represented Ms. Crice, a codefendant and accomplice. The court responded that it was appointing Mr. Gallina and that Mr. Gallina could inform the court of any conflict. The record references that Ms. Crice was to appear after Ms. Wilson at the custodial bail hearing, but does not state who appeared as counsel. Mr. Gallina was appointed co-counsel 18 days before trial. During the trial, the prosecutor informed the court that Ms. Crice would be called as a witness and that she had been granted immunity. Defense counsel did not object.
¶ 45 The Rules of Professional Conduct (RPC) govern attorney representations when *894 the interests of a current client conflict with those of a former client. RPC 1.9 reads:
(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
(1) whose interests are materially adverse to that person; and
(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.
(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.
¶ 46 Ms. Wilson contends that the trial court erred by failing to conduct an inquiry into whether Mr. Gallina had a conflict because of his previous representation of Ms. Crice.
¶ 47 The trial court made no inquiry despite Ms. Richard's statement that Mr. Gallina represented Ms. Crice. The State argues in its brief that Mr. Gallina did not have a conflict.
¶ 48 In State v. Dhaliwal, our Supreme Court held that the trial court's inquiry into potential conflict was insufficient and that evidence of actual conflict was likewise insufficient to justify remand. State v. Dhaliwal, 150 Wash.2d 559, 573, 79 P.3d 432 (2003). Here, we can make no determination of an actual conflict because the court made no inquiry at all and the record is incomplete.
¶ 49 D. Admission of Custodial Statements. Ms. Wilson contends the trial court erred by not suppressing the statement she made after she invoked her right to counsel. She asserts the officers engaged in further interrogation when they told her Mr. Thrush had died.
¶ 50 Ms. Wilson was interrogated by Deputy Daniel Hally at the Garfield County Jail. Deputy Hally advised her of her Miranda[3] rights. Ms. Wilson executed a written waiver of her rights. During the interview, Ms. Wilson described a struggle where Mr. Thrush tried to smother her with a pillow. She began talking about the kitchen, but then she made a reference to an attorney. The interview was terminated. Later, Deputy Hally reentered the interrogation room and gave her a "death notification" that "her husband" had died. RP (Aug. 25, 2005) at 50-51. Ms. Wilson collapsed and said: "`I didn't mean to kill him. I didn't mean to stab him.'" RP (Aug. 25, 2005) at 51. The trial court concluded that this statement was admissible because the officer delivering the death notification had no intent to elicit an incriminating response.
¶ 51 Evidentiary rulings will not be disturbed on appeal absent an abuse of discretion. State v. Lane, 125 Wash.2d 825, 831, 889 P.2d 929 (1995). A trial court abuses its discretion only if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971). "[T]he rule to be applied in confession cases is that findings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record." State v. Broadaway, 133 Wash.2d 118, 131, 942 P.2d 363 (1997). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, *895 rational person of the truth of the finding." State v. Hill, 123 Wash.2d 641, 644, 870 P.2d 313 (1994).
¶ 52 Our review is limited to the court's oral ruling at the CrR 3.5 hearing. No finding of fact or conclusion of law as required by CrR 3.5(c) is found in the record.
¶ 53 Ms. Wilson argues that the officers renewed their interrogation after she made a request for an attorney. The applicable law was set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Miranda held that:
If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.
. . . .
If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.
Id. at 473-75, 86 S.Ct. 1602.
¶ 54 The Supreme Court in Rhode Island v. Innis set forth a test to determine whether statements made while in custody are the product of interrogation. Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Court held that interrogation occurs and, therefore, the Miranda protections apply "whenever a person in custody is subjected to either express questioning or its functional equivalent." Id. (emphasis added). The functional equivalent of express questioning was defined by the Court as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301, 100 S.Ct. 1682. The last part of the definition focuses on the perceptions of the suspect, rather than on the intent of the police. Id.; see also State v. Grisby, 97 Wash.2d 493, 505, 647 P.2d 6 (1982).
¶ 55 Here, the trial court ruled that Ms. Wilson's statement was admissible because the officer delivering the death notification did not intend to elicit an incriminating response. But this is not the test. The proper test is whether the words notifying Ms. Wilson that her "husband" was dead were spoken by an officer when he should have known that the words were reasonably likely to elicit an incriminating response. Here, the officer delivered the death notification to Ms. Wilson after she requested counsel.
¶ 56 Ms. Wilson was in jail for stabbing Mr. Thrush. Ms. Wilson had requested counsel, and her interview with police had been terminated. Given Ms. Wilson's situation, the officer should have known that the death notification was reasonably likely to elicit an incriminating response. The officer should not have initiated a conversation with Ms. Wilson by stating that Mr. Thrush had died. The court erred by allowing Ms. Wilson's statement after she invoked her right to counsel.
¶ 57 The admission of Ms. Wilson's statement to police was constitutional error and not harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Here, although other witnesses testified about Ms. Wilson's actions, an officer's testimony about a confession has significant impact on a jury and was not harmless beyond a reasonable doubt.
¶ 58 E. Remaining Grounds for Appeal. Because we reverse and remand for a new trial, we need not address Ms. Wilson's remaining grounds for appeal.
WE CONCUR: SCHULTHEIS, C.J., and STEPHENS, J. Pro Tem.
NOTES
[1] No relation to Ms. Wilson.
[2] DNA (deoxyribonucleic acid).
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).