FILED
COURT OF APPEALS
DIVISION II

2013 FEB 26 AM 10: 20

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41769-3-II |
| Respondent, | |
| v. | |
| ETIENNE LUCIER CHOQUETTE, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, P.J. — Etienne Lucier Choquette appeals his jury trial conviction and sentence for first-degree murder with a firearm sentencing enhancement. He argues that the trial court (1) violated his Fifth and Fourteenth Amendment[1] rights by admitting statements he made after unequivocally requesting an attorney, (2) erred by instructing the jury that his case did not involve the death penalty, (3) erred by imposing 24 to 48 months of community custody rather than the statutorily-required 36-month term, and (4) erred by imposing legal financial obligations (LFOs) without first determining his ability to pay them. Holding that error, if any, was harmless, we affirm Choquette's conviction and the trial court's imposition of LFOs. Accepting the State's concession of error on the length of Choquette's community custody term, we remand to the trial court to correct this portion of his sentence.

---

[1] U.S. CONST. amend. V, XIV.

## FACTS

### I. BACKGROUND

Etienne Choquette met Kellie White in 2009, grew close to her and her three young children, and spent nearly every day with them. Although White and Choquette's relationship was platonic, Choquette hoped that it would develop into a romantic relationship once White had fully healed from an abusive relationship with her ex-boyfriend Antonio Rodriguez Maldonado.

In early September 2009, Maldonado beat White badly, bruising the side of her face, neck, leg, and abdomen. White was upset and feared authorities would take her children away from her because Maldonado kept coming to her home and violating his restraining orders. When Choquette saw White's bruises and asked her what happened, she told him that Maldonado had beaten her up again and that she felt "the only way [he was] ever going to leave [her] alone [was] *if he was dead.*" Verbatim Report of Proceedings (VRP) (Dec. 7, 2010) at 87 (emphasis added). Choquette, who had previously gotten "verbal" and "angry" with Maldonado during a meeting with child protective services, responded that he would "do whatever he could" to "prevent [Maldonado] from ever hurting [her] again." VRP (Dec. 7, 2010) at 87, 89.

### A. First Degree Murder

Around 10:00 PM on September 24, Maldonado went to White's house and entered through a window. White told him that he needed to leave or her daughter would call the police; he left shortly thereafter. At around 10:30 PM, Maldonado was shot and killed walking near White's residence.

A couple blocks away, two witnesses saw a black Chevy Blazer or Camaro parked and heard one gunshot followed by a loud male voice. Four seconds later, they heard the car's door

open, noticed that it had a distinctive "squeak," and then heard two more gunshots fired in rapid succession. VRP (Dec. 7, 2010) at 15. The car sped off, accelerating toward the witnesses. Neither witness saw the driver of the car, although one of the witnesses believed that the car's license plate number ended in "827." Clerk's Papers (CP) at 105.

The police suspected that Choquette might have killed Maldonado in retaliation for abusing White. Choquette owned a black Chevy Blazer, but its license plate did not end in "827." CP at 105. The day after Maldonado's shooting, the police interviewed White. She told Sergeant Darryl Elmore that (1) Maldonado had broken into her house the night of the shooting and she had threatened to call the police if he did not leave; (2) Choquette was "in love" with her and she had told him on at least three occasions that she wanted Maldonado "dead"; and (3) she was "99.9 percent certain" that Choquette had killed Maldonado. VRP (Dec. 7, 2010) at 104. The police then drove to Choquette's house, took him into custody, and transported him to the Forks Police Department, where police officers interviewed him.

### B. Choquette's Statements to Police

On September 25 and 26, the police conducted two tape-recorded interviews with Choquette, which ultimately resulted in his confessing to Maldonado's murder. On September 27, they conducted a non-tape-recorded follow-up interview during which he made more incriminating statements.

#### 1. September 25 statements to Sergeant Elmore

On the evening of September 25, Sergeant Elmore began the first tape-recorded interview with Choquette. At the beginning of the interview, Elmore read Choquette his *Miranda*[2] rights.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

No. 41769-3-II

Choquette acknowledged that he understood his rights, signed a written waiver of his rights,[3] and agreed to speak with Elmore.

Choquette maintained his innocence throughout the interview and provided an alibi for the crime. He told Elmore that (1) he had gone to White's house on September 24 around 10:30 PM to check up on her; (2) he had stayed about 5 to10 minutes; and (3) then he had left to pick up his friend, Tyson LaGambina, to drive around and to talk. Near the end of the interview, Elmore informed Choquette that he would remain in custody and be transported to the county jail. After expressing concern about needing his multiple sclerosis medications and someone to look after his dog, Choquette mentioned that he would need an attorney at some point.

The following dialog ensued:

[CHOQUETTE]: There are a couple of things that we need to go over.
[ELMORE]: Sure.
[CHOQUETTE]: My medications.
[ELMORE]: Okay, that will be ultimately with the corrections staff and I'll let them know I'm going to give you an opportunity to speak with them not only here but you'll need to do that with uh, with uh, Clallam County.
    You're not going to stay here, you're going to end up over in the Clallam County Jail because that's where we hold our felons.
[. . .]
[CHOQUETTE]: Okay.
[. . .]
[ELMORE]: All right, so do you have anything else to add?
[CHOQUETTE]: I'm just concerned about my medication.
[ELMORE]: Okay.
[CHOQUETTE]: And my dog.
[ELMORE]: Your brother's got your dog.

---

[3] Choquette signed a "Digitally Recorded Defendant Statement." CP at 83. This document listed his constitutional rights and contained the following waiver provision:
    I have read or had read to me the above explanation of my constitutional rights and I understand them. I have decided not to exercise these rights at this time. *Any statements made by me are made freely, voluntarily, and without threats or promises of any kind.*
CP at 83 (emphasis added).

4

[CHOQUETTE]: He does have my dog?

[ELMORE]: He does, yes.

[CHOQUETTE]: Okay and um, you know, if you could get a message to him to uh, whether to take him to Sharon's or I don't know what he wants to do with him.

He's not exactly set up to take care of him but uh, if he could take him to Sharon's.

[ELMORE]: Okay, I'll do that. To Sharon's?

[CHOQUETTE]: *And obviously I'm going to need an attorney.*

[ELMORE]: Yes.

[CHOQUETTE]: So what do we do about that?

[ELMORE]: *You'll be arraigned, you'll be arraigned and once that happens I'm going to present the probable cause that I believe I have.*

At some point or other you will be asked if you can afford an attorney, if you choose to they'll appoint an attorney for you if you meet the criteria for a public defender, so.

[CHOQUETTE]: And when will that be?

[ELMORE]: Uh, Monday, I would, *I would anticipate Monday.* Okay[?]

[CHOQUETTE]: Can I still have that cigarette?

[ELMORE]: I promised you that, I'll make sure it happens.

Ex. 34 at 3-5 (emphasis added). After this exchange, Choquette reiterated his concerns for his medications and his dog's welfare, but he did not ask for an attorney. The interview ended shortly thereafter, with no substantive information about the case being discussed. According to Elmore, LaGambina denied having been with Choquette at the time of the shooting.

### 2. September 26 statements to Sergeant Elmore

The next day, Elmore again interviewed Choquette. Believing that this interview was a continuation of the interview the day before, during which Choquette had not requested an attorney for his police interviews, Elmore did not re-advise Choquette of his *Miranda* rights or ask him to sign a new written waiver before the interview. Elmore did, however, ask Choquette if he understood that his statement was "being recorded with his consent," to which Choquette responded, "Yes." VRP (Sept. 29, 2010) at 44; Ex. 35 at 2.

5

During the interview, Elmore reviewed the evidence against Choquette and informed him that LaGambina had refused to corroborate his alibi and that White had said she was "99 percent [certain]" that he (Choquette) had killed Maldonado. Ex. 35 at 3. Choquette stated that White had made "overtures" on more than one occasion that she had wanted him to kill Maldonado, but he maintained his innocence of the murder. Ex. 35 at 26. At no point during this September 26 interview did Choquette ask to speak with an attorney or indicate that he did not want to speak with the police.

As the interview progressed, Elmore stated that he believed Choquette was not capable of premeditated murder and that he had committed only a "crime of passion"; Elmore also noted that there were "distinctive difference[s] in the sentencing guidelines" between manslaughter and first-degree murder. Ex. 35 at 45. According to Elmore, Choquette asked him to turn the tape recorder off so that they could discuss the differences between manslaughter and first-degree murder, and they spoke off the record for a significant period of time. During their time off the record, (1) Elmore and Choquette discussed the "premeditation" element of first-degree murder; (2) Choquette asked whether the prosecutor "would make any deals" in exchange for a guilty plea; (3) in exchange for pleading guilty to first-degree murder, Choquette wanted "reasonable bail" (so he could take care of his personal matters) and White released from any criminal culpability for murder and conspiracy to commit murder; (4) Elmore agreed to call the prosecutor but told Choquette that he could not make any "promises" that the prosecutor would agree to a deal, VRP (Sept. 29, 2010) at 45, 47, 48; (5) Elmore called the "on-call prosecutor" on Choquette's behalf; and (6) Elmore communicated to Choquette that the prosecutor was not willing to make any deals in exchange for a guilty plea. VRP (Sept. 29, 2010) at 48.

According to Elmore, Choquette continued to agree to speak with him. When the tape recorder resumed, Elmore stated that he and Choquette had been discussing "the circumstances around [Maldonado's] death," that Choquette should go ahead and make "that statement," and that he (Elmore) would also "appreciate knowing where the gun is." Ex. 35 at 49. Choquette then confessed to killing Maldonado as follows: On the evening of September 24, Choquette went to White's house to check up on her. After he left her house, he saw Maldonado walking in the neighborhood and tried to get Maldonado into his car so he could take him somewhere to "beat the sh*t out of him"; he did not intend to kill Maldonado, but he "snapped" and "lost it" when Maldonado would not get into his car. Ex. 35 at 51. Choquette then pulled out his Colt .38 caliber revolver, fired "three shots" at Maldonado (the first one from inside his car and the last one from outside the car just "inches" from Maldonado's head), and threw his gun into the river from a bridge on La Push Road. Ex. 35 at 52, 64.

3. September 26 statements to Officer Shannon during escort back to holding cell

Officer Michael Shannon had been seated about 10 to 15 feet outside the closed door, but he had not participated in Elmore's interview of Choquette. Elmore asked Shannon to escort Choquette back to the holding cell. Shannon neither spoke to Choquette nor attempted to interview him during the escort. As they neared the holding cell, Choquette turned to Officer Shannon and stated: "[C]an I tell you something[?] I didn't want this on tape[.] *I did the right thing, he needed to die*." VRP (Sept. 29, 2010) at 12 (emphasis added).

7

### 4. September 27 statements to Officer Hoagland

On September 27, Officer Gene Hoagland conducted a follow-up interview with Choquette to learn more about the gun's location. Hoagland read Choquette his *Miranda* rights before speaking with him. Choquette acknowledged that he understood his rights and agreed to talk. Choquette described the gun's color and the location where he had disposed of it in the river. At no point during this interview, did Choquette ask for an attorney or indicate that he did not want to speak with Hoagland.

Based on the information Choquette provided in his interviews, the police recovered a .38 caliber revolver from the river location that Choquette had described. A forensic analyst later examined the gun and concluded that it may have been in the water only a couple days, despite its rusty and deteriorated condition. The police were not able to recover any DNA (deoxyribonucleic acid) or fingerprints from the weapon.

## II. PROCEDURE

The State charged Choquette with first-degree murder with a firearm sentencing enhancement. His case was tried by a jury.

### A. Pretrial

#### 1. CrR 3.5 hearing

Choquette moved to suppress the statements that he had made to Elmore and Shannon on September 26.[4] CP at 75. Elmore testified that, at no point during the September 25 and 26 interviews, did Choquette "ask for an attorney" or state that he did not want to talk to the police.

---

[4] Choquette did not, however, move to suppress the statements that he had made to Hoagland during a later interview on September 27.

8

VRP (Sept. 29, 2010) at 44. Elmore denied having made any promises to Choquette while the tape recorder was off; Elmore further testified that Choquette had voluntarily confessed, even after knowing the prosecutor would not offer him a "deal" in exchange for a guilty plea. VRP (Sept. 29, 2010) at 48.

Choquette testified that (1) he understood his *Miranda* rights at the beginning of the September 25 interview; (2) nothing had changed between his September 25 interview and his September 26 interview to make him think that his rights no longer applied; (3) he still understood that he did not have to talk to Elmore and that he had a right to an attorney during the interviews; and (4) during the period when the tape recorder was turned off during the September 26 interview, Elmore told him that the prosecutor had agreed to make a "deal"[5] in exchange for his (Choquette's) confession and that the police would not honor this deal. VRP (Sept. 29, 2010) at 79.

The trial court found that (1) Choquette did not request an attorney on September 25; (2) although Elmore and Choquette had discussed possible "deals," no promises were made; and (3) all of Choquette's statements to Elmore and to Shannon on September 25 and 26 were "voluntary, with a full understanding of his rights" and were, therefore, admissible. CP at 80, 82. The trial court denied Choquette's motion to suppress.

### 2. Preliminary jury instructions

At a pretrial conference before jury voir dire, the trial court and counsel discussed how the court should introduce the case to the jury pool. Choquette asked the trial court (1) to refer to

---

[5] According to Choquette, Elmore told him, "[W]e have a deal and let's go make a statement." VRP (Sept. 29, 2010) at 79.

him by his nickname, "Lucky"; and (2) to inform the jury pool that he was charged with first-degree murder while armed with a firearm, rather than reveal that his charges involved "premeditated" intent. VRP (Dec. 6, 2010) at 7. The trial court granted these two requests.

The State suggested that the trial court inform the jury that, although Choquette was charged with first-degree murder, his case did not involve a death penalty sentence. Choquette did not object. The trial court, however, did not respond to the State's request for a "non-death penalty" instruction. VRP (Dec. 6, 2010) at 7. And neither counsel mentioned this instruction again during the pretrial conference.[6]

## B. Trial

The State's witnesses provided testimony consistent with the facts we have already set forth. In addition, one of the witnesses to the shooting identified Choquette's black Chevy Blazer as the car she had seen leaving the scene. When the police examined the vehicle, they noticed that the driver's side door "squeaked loudly and noticeably." VRP (Dec. 8, 2010) at 5. The State played Choquette's recorded statements for the jury. LaGambina testified that he had not been with Choquette at any time on the day of the murders.

A police officer who had supervised the investigation testified that Maldonado's autopsy produced two .38 caliber bullets. The first bullet had passed through Maldonado's arm and entered his chest cavity. The second bullet, fired at close range, had hit Maldonado in the back

---

[6] The record before us on appeal does not include the trial court's pre-trial instructions to the jury. The record we do have, however, does not include any such instruction to the jury when the trial court introduced the case to them during voir dire. *See* VRP (Dec. 6, 2010) at 62-75.

of the neck near the base of his skull. The State's forensic analyst determined that the gun recovered from the river "could have fired" the two bullets recovered from Maldonado's body, but the gun's deteriorated condition prevented a "conclusive identification." VRP (Dec. 8, 2010) at 142, 145.

Choquette also testified in his own defense. He admitted telling White that he would do anything he could to prevent Maldonado from hurting her but claimed he had intended only to give Maldonado "some of his own medicine"—or a "good beating." VRP (Dec. 13, 2010) at 21, 22. He denied having had anything to do with Maldonado's death. Instead, he testified that he had gone to White's house to check up on her around 10:30 PM on September 24, stayed 5 to 10 minutes, left to pick up LaGambina to drive around and to talk, and returned home around 11:30 PM.

Choquette testified that he had been with LaGambina at the time of the shooting and that he had given a false confession to the police in exchange for assurances that (1) he would be charged with manslaughter instead of first-degree murder, (2) White would be released from custody and would "go free," and (3) he would receive a $25,000 bail so he could get his affairs in order before sentencing. VRP (Dec. 13, 2010) at 37. And he denied having stated to Shannon during his escort back to his jail cell following his September 26 interview with Elmore, "[C]an I tell you something[?] I didn't want this on tape[.] I did the right thing, he needed to die." VRP (Sept. 29, 2010) at 80. Although Choquette admitted that the gun recovered from the river belonged to him, he claimed he had thrown it into the river two weeks before the shooting because he thought the gun was stolen. The jury convicted Choquette of first-degree murder and returned a special verdict, finding that he had committed the crime with a firearm.

No. 41769-3-II

## C. Sentencing

The trial court imposed a low-end standard range sentence of 240 months of confinement for Choquette's murder conviction and an additional 60 months for his firearm sentencing enhancement. The trial court also imposed "24 to 48 months" of community custody under former RCW 9.94A.701 (2009). VRP (Feb. 3, 2011) at 13. The trial court imposed legal financial obligations (LFOs), ordering Choquette to pay for costs associated with his trial. Choquette appeals.

## ANALYSIS

## I. STATEMENTS TO POLICE

Choquette argues that he unequivocally requested an attorney at the end of his September 25 interview with Elmore; and, therefore, the trial court violated his Fifth and Fourteenth Amendment rights[7] by denying his motion to suppress the statements he made to Elmore and Shannon after that alleged request.[8] We address each statement in turn.

---

[7] U.S. CONST. amend. V, XIV.

[8] In his reply brief, Choquette also attempts to argue for the first time that the trial court should have suppressed his September 27 statements to Officer Hoagland because, even though Hoagland read Choquette his *Miranda* rights before the interview and he agreed to speak with Hoagland, the police still had not made an attorney available to him after his alleged September 25 "request." Reply Br. of Appellant at 8. We do not further consider this issue for two reasons: First, Choquette did not preserve the issue below because he never moved to suppress this statement. Second, he attempts to raise the issue for the first time on appeal in his reply brief, which the Rules of Appellate Procedure do not allow. RAP 10.3(c); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Choquette did not move below to suppress the September 27 statements he made to Officer Hoagland; thus, the trial court's CrR 3.5 hearing did not address these statements. Although the record before us on appeal does not contain Choquette's motion to suppress, the trial court's CrR 3.5 memorandum opinion states that Choquotte moved "to suppress any and all statements . . . made to . . . the Forks Police Department on September 25, 2009 and September

12

A. September 25 and 26 Interview Statements to Sergeant Elmore: Harmless Error

We do not address whether Choquette unequivocally requested an attorney at the end of his September 25 interview with Elmore or whether the trial court violated Choquette's constitutional rights in admitting the statements he made to Elmore during their September 26 interview the next day. Instead, we agree with the State and hold that, even if Choquette invoked his right to counsel at the end of the September 25 interview, admission of his September 26 confession to Elmore was harmless error.

A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). Such is the case here. The State presented strong circumstantial evidence that Choquette had a motive to kill Maldonado: The testimony showed that Choquette was in love with White, and he had recently gotten angry with Maldonado and was upset that he had physically abused her. White had told Choquette on more than one occasion that she wanted Maldonado dead, and Choquette had promised to do what he could to "prevent [Maldonado] from ever hurting [her] again." VRP (Dec. 7, 2010) at 87.

---

26, 2009." CP at 75. Thus, Choquette's statements to Officer Hoagland on September 27 were not before the trial court.

To preserve a *Miranda* waiver advisement issue for appeal, a defendant must raise the issue at his "'CrR 3.5 hearing or the fact-finding portions of the proceedings.'" *State v. Campos-Cerna*, 154 Wn. App. 702, 710, 226 P.3d 185 (2010) (quoting *State v. Spearman*, 59 Wn. App. 323, 325, 796 P.2d 727, *review denied*, 115 Wn.2d 1032 (1990)). This Choquette failed to do. Furthermore, he makes no attempt on appeal to argue why we should nevertheless consider this issue under the manifest constitutional error exception in RAP 2.5(a).

Choquette's opening brief of appellant does not include a challenge the admissibility of his September 27 statements to Hoagland. Instead, he raises this argument for the first time in his reply brief, which is "too late to warrant consideration." *Cowiche Canyon Conservancy*, 118 Wn.2d at 809; *see also* RAP 10.3(c).

Although Choquette testified that he meant he would only give Maldonado "a good beating," White told the police that she was "99.9 percent certain" that he had killed Maldonado.[9] VRP (Dec. 7, 2010) at 104.

Choquette's trial testimony and his September 25 interview statements to Elmore before mentioning an attorney also placed him (Choquette) at the scene of the crime. One of the eyewitnesses identified Choquette's black Chevy Blazer as the car driving away from the scene. When the police later examined the vehicle, they noticed that the driver's side door "squeaked loudly and noticeably," which was consistent with the eyewitness's testimony. VRP (Dec. 8, 2010) at 5. Choquette also admitted at trial that the .38 caliber revolver recovered from the river was his.

Choquette's trial testimony was consistent with his earlier voluntary statement to Officer Hoagland on September 27, when, after again being advised of his *Miranda* rights and again waiving them, Choquette had told Hoagland where he had thrown the gun into the river. Although Choquette's recovered gun's condition was too deteriorated for conclusive testing, according to expert forensic testimony, it matched the type of gun that shot the .38 caliber bullets found in Maldonado's body. And, as Choquette was being escorted back to the holding cell, he spontaneously told Officer Shannon that he had killed Maldonado because Maldonado "needed to die." VRP (Sept. 29, 2010) at 12. Based on this untainted evidence, we hold that the admission of Choquette's September 26 confession to Elmore was harmless beyond a reasonable doubt.

---

[9] Choquette did not object to the trial court's admission of this evidence.

B. Spontaneous September 26 Statements to Officer Shannon

Choquette also argues that the spontaneous statements he made to Officer Shannon on September 26 while Shannon was escorting him to his cell were likewise inadmissible because (1) the statements were "part and parcel of [Sergeant Elmore's] unconstitutional interrogation," and (2) they were not a "separate conversation" initiated by Choquette. Br. of Appellant at 15. This argument also fails.

We review a trial court's findings of fact following a CrR 3.5 motion to suppress for substantial evidence; we review de novo whether the trial court's factual findings support its conclusions of law.[10] Substantial evidence is evidence sufficient to persuade "'an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed.'"[11] We consider unchallenged findings of fact verities on appeal. *State v. Lorenz*, 152 Wn.2d 22, 30, 93 P.3d 133 (2004).

*Miranda* procedural protections are implicated only when a suspect is subjected to "custodial interrogation." *Roberts v. United States*, 445 U.S. 552, 560-61, 100 S. Ct. 1358, 63 L. Ed. 2d 622 (1980); *see also Miranda*, 384 U.S. 436; *State v. Sargent*, 111 Wn.2d 641, 647, 762 P.2d 1127 (1988). A suspect is in "custody" for *Miranda* purposes when a "reasonable person in [the] suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest." *State v. Heritage*, 152 Wn.2d 210, 218, 95 P.3d 345 (2004). "Interrogation" includes express questioning and its functional equivalent, which the United

---

[10] *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002); *State v. Grogan*, 147 Wn. App. 511, 516, 195 P.3d 1017 (2008), *adhered to on remand*, 158 Wn. App. 272, 246 P.3d 196 (2010).

[11] *State v. Summers*, 107 Wn. App. 373, 388, 28 P.3d 780, 43 P.3d 526 (2001) (quoting *State v. Hutton*, 7 Wn. App. 726, 728, 502 P.2d 1037 (1972)).

States Supreme Court has defined as "*any words or actions on the part of the police* . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Wilson*, 144 Wn. App. 166, 184, 181 P.3d 887 (2008) (emphasis added) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)). The last part of this definition focuses on the perceptions of the suspect, rather than on the intent of the police. *Wilson*, 144 Wn. App. at 184. As a corollary, a suspect's "voluntary, spontaneous, and unsolicited" statements are not the product of "interrogation" for *Miranda* purposes. *State v. Miner*, 22 Wn. App. 480, 483, 591 P.2d 812 (1979).

A trial court determines the voluntariness of a defendant's statement by reviewing the totality of the circumstances. *State v. Aten*, 130 Wn.2d 640, 663-64, 927 P.2d 210 (1996).

> When a trial court determines a confession is voluntary, that determination is not disturbed on appeal if there is substantial evidence in the record from which the trial court could have found the confession was voluntary by a preponderance of the evidence.

*Aten*, 130 Wn.2d at 664. "A suspect or an accused who invokes the right to counsel but then initiates further communication or conversation with law enforcement officers without a lawyer is subject to further interrogation." *Aten*, 130 Wn.2d at 666 (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)).

The trial court found that, while in custody, Choquette initiated his inculpatory statements to Shannon and that these statements were not the product of police interrogation. Because

Choquette does not assign error to this finding,[12] we assume it is a verity for purposes of this appeal.[13] *Lorenz*, 152 Wn.2d at 30. Under *Aten*, even if Choquette had previously invoked his right to counsel during his interview with Elmore, his initiating statements to Shannon were voluntary, not the product of police interrogation, and, thus, not subject to suppression. We hold, therefore, that the trial court did not err in admitting these statements at trial.

## II. NON-DEATH-PENALTY INSTRUCTION

Choquette next argues that the trial court erred by instructing the jury before trial that this was "not a death penalty case." Br. of Appellant at 18. The State responds that nothing in the record shows the trial court gave such an instruction. The State is correct.

The record before us on appeal does not reflect that the trial court instructed the jury that Choquette was not facing the death penalty.[14] Thus, the facts here differ from those in *Townsend*, where the trial court committed reversible error by expressly stating to the jury during voir dire, "'This is not a case in which the death penalty is involved.'" *State v. Townsend*, 142

---

[12] Instead, Choquette challenges only the trial court's finding that he made these statements on "September 25." Br. of Appellant at 14. Although the trial court's CrR 3.5 memorandum opinion stated that Choquette made these statements after his interview on September 25, not September 26, this obvious scrivener's error does not affect the admissibility of these spontaneous statements.

[13] Nevertheless, we note that record supports the trial court's finding. Although Choquette was in custody, Shannon did not question, begin a conversation with, or otherwise elicit any statements from Choquette while escorting him back to the holding cell on September 26. Rather, it was Choquette who spontaneously said to Shannon: "[C]an I tell you something[?] I didn't want this on tape[.] *I did the right thing, he needed to die.*" VRP (Sept. 29, 2010) at 12 (emphasis added).

[14] Instead, the record shows that the State merely *suggested* pretrial, outside the jurors' presence, that "it may be a good idea . . . if the [c]ourt let[ ] them know up front that this is not a death penalty case." VRP (Dec. 6, 2010) at 7.

17

Wn.2d 838, 842, 15 P.3d 145 (2001) (quoting Suppl. Partial Report of Proceedings at 2). Choquette's argument fails.

### III. SENTENCING

#### A. Community Custody

Choquette argues that the trial court erred in imposing "'24-48 months'" of community custody because former RCW 9.94A.701 (2009) requires a fixed community custody term of 36 months. Br. of Appellant at 20. The State concedes that the community custody portion of Choquette's sentence is erroneous. Br. of Resp't at 34. We agree.

Former RCW 9.94A.701(1)(b) provided:

> If an offender is sentenced to the custody of the department for one of the following crimes, the court *shall*, in addition to the other terms of the sentence, *sentence the offender to community custody for three years*:
> [. . .]
> (b) A serious violent offense.

(Emphasis added). First-degree murder is a "serious violent offense" under former RCW 9.94A.030(41)(a)(i) (2009), the sentencing statute in place at the time of Choquette's crime. Because former RCW 9.94A.701 required a mandatory three-year community custody term, we accept the State's concession of error and hold that the trial court erred in imposing 24 to 48 months of community custody.

#### B. Legal Financial Obligations

Choquette also argues that the trial court erred in imposing $968.56 in LFOs because he is indigent, he lacks the present or future ability to pay these financial obligations, and the trial court made no factual findings about his ability to pay at the time of sentencing. We do not

address this issue because the State has not yet attempted to collect these fees and, therefore, the issue is not ripe.

The trial court may order a defendant convicted of a felony to repay court costs, including attorney fees, as part of his judgment and sentence. Former RCW 10.01.160(1)-(2) (2009); *State v. Smits*, 152 Wn. App. 514, 519, 216 P.3d 1097 (2009). A trial court, however, may not order a defendant to repay such costs unless the defendant "is or will be able to pay them."[15] RCW 10.01.160(3).

We review a trial court's decision to impose LFOs on a defendant for an abuse of discretion. *See State v. Curry*, 118 Wn.2d 911, 916, 829 P.2d 166 (1992). Neither the statute nor the constitution requires the trial court to enter formal, specific findings about a defendant's

---

[15] RCW 10.01.160(3) further provides: "In determining the amount and method of payment of costs, the [trial] court *shall* take account of the *financial resources of the defendant and the nature of the burden* that payment of costs will impose." (Emphasis added). Choquette was indigent and represented by court appointed counsel at trial. Choquette testified that (1) a car accident had rendered him disabled; (2) since his accident, he had been living off Social Security Insurance; and (3) he suffers from multiple sclerosis. At sentencing, the trial court stated that it would order the costs and fees that it "typically impose[d]" but it did not expressly address Choquette's present or future ability to pay them. VRP (Feb. 3, 2010) at 14.

The State contends that there is factual support in the record for Choquette's ability to pay his LFOs at the time of sentencing because he had requested "reasonable bail" of $25,000 and, thus, had access to sufficient funds to pay less than $1,000 in LFOs. Br. of Resp't at 33. The State further notes that if these LFOs "present a financial hardship for Choquette then he may petition the court at any time for remission or modification of the payments," Br of Resp't at 33 (citing RCW 10.01.160(4)).

RCW 10.01.160(4) provides, in part:

> If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the defendant or the defendant's immediate family, the court may remit all or part of the amount due in costs, or modify the method of payment under RCW 10.01.170.

This portion of the statute undergirds our ripeness analysis here and in *State v. Bertand*, 165 Wn. App. 393, 405, 267 P.3d 511 (2011), *review denied*, 175 Wn.2d 1014 (2012).

ability to pay LFOs.[16] Nevertheless, the record must be sufficient for us to review whether "'the trial court judge took into account the financial resources of the defendant and the nature of the burden'" under a clearly erroneous standard. *State v. Bertand*, 165 Wn. App. 393, 404, 267 P.3d 511 (2011) (quoting *State v. Baldwin*, 63 Wn. App. 303, 312, 818 P.2d 1116, 837 P.2d 646 (1991)), *review denied*, 175 Wn.2d 1014 (2012).

As we recently held in *Betrand*:

> "[T]he meaningful time to examine the defendant's ability to pay is *when the government seeks to collect the obligation.*"

*Bertrand*, 165 Wn. App. at 405 (emphasis added) (quoting *Baldwin*, 63 Wn. App. at 310) (citing *State v. Curry*, 62 Wn. App. 676, 680, 814 P.2d 1252 (1991), *aff'd*, 118 Wn.2d 911).[17] We further noted:

> "The defendant may petition the court at any time for remission or modification of the payments on [the basis of manifest hardship]. Through this procedure the defendant is entitled to *judicial scrutiny* of his obligation and *his present ability to pay at the relevant time.*"

*Bertrand*, 165 Wn. App. at 405 (alteration in original) (quoting *Baldwin*, 63 Wn. App. at 310-11). Because it does not appear that the State has yet tried to collect Choquette's legal financial obligations, we hold that this issue is not ripe for review and we do not further consider it.

---

[16] *Curry*, 118 Wn.2d at 916.

[17] *See also State v. Crook*, 146 Wn. App. 24, 189 P.3d 811 (2008), *review denied*, 165 Wn.2d 1044 (2009). In *Crook*, Division Three of our court held: "Inquiry into the defendant's ability to pay is appropriate only when the State enforces collection under the judgment or imposes sanctions for nonpayment; a defendant's indigent status at the time of sentencing does not bar an award of costs." *Crook*, 146 Wn. App. at 27.

20

No. 41769-3-II

Accordingly, we affirm Choquette's conviction and the trial court's imposition of LFOs; and we remand to the trial court to correct his community custody term.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Hunt, P.J.

We concur:

_____
Van Deren, J.

_____
Bridgewater, J.P.T.

21